2004-NMSC-039

103 P.3d 571

**Deanna NAVA, Plaintiff–Appellee– Cross–Appellant,**

v.

**CITY OF SANTA FE, a municipality under state law, Defendant– Appellant–Cross–Appellee.**

**No. 28,220.**

Supreme Court of New Mexico.

Oct. 13, 2004.

Rehearing Denied Nov. 18, 2004.

Mark D. Jarmie, Albuquerque, NM, Mark L. Allen, Assistant City Attorney, Santa Fe, NM, for Appellant–Cross–Appellee.

Michael Schwarz, Santa Fe, NM, for Appellee–Cross–Appellant.

## OPINION

MINZNER, Justice.

{1} Defendant City of Santa Fe appeals directly to this Court from an adverse judgment in favor of Plaintiff Deanna Nava on her New Mexico Human Rights Act (NMHRA) claim. At trial, Plaintiff alleged her immediate supervisor discriminated against her because of her sex, and Defendant, as her employer, knew of this discrimination and failed to take remedial action. On appeal, Defendant claims that the district court erred in its instructions to the jury and that there was not substantial evidence to support the jury's verdict. Plaintiff cross-appeals claiming that the district court erred by granting Defendant's motion for remittitur, refusing to award statutory interest against Defendant, and reducing her attorney's requested fees. We have jurisdiction in this case pursuant to NMSA 1978, § 28–1–13(C) (1987), which provides for direct appeal to the Supreme Court for claims made under the NMHRA. We affirm the district court on each of the issues raised in this appeal.

## I

{2} Plaintiff has been employed by Defendant as a police officer since 1993. In January 1999, one of her first-line supervisors became Sgt. Clarence Gallegos. In July 2000, the Santa Fe police department was reorganized and Plaintiff was reassigned to a different squad. Therefore, she remained under the supervision of Sgt. Gallegos for approximately nineteen months. Plaintiff claims that during this nineteen-month period she was harassed by Sgt. Gallegos on an almost daily basis because of her sex, and this harassment resulted in a hostile work environment. At trial, Plaintiff testified that Sgt. Gallegos checked on her location more than other officers, raised his voice to her, denied her many of the same privileges male officers were afforded, followed her to her house to monitor how long she took on bathroom breaks, assigned rape calls to her even when other officers were closer to the scene of the crime, and threw a file folder at her on one occasion. The jury found for Plaintiff and awarded her $285,000 in damages.

{3} Following the verdict, the district court ruled on several post-trial motions. The district court denied Defendant's motion for a new trial, but granted a remittitur of the jury's verdict to $90,250. The district court also refused to award Plaintiff post-judgment interest because Defendant, as a political subdivision of the State, was exempt from paying such interest. Finally, although Plaintiff's attorney sought statutory attorney's fees at a rate of $230 per hour, the district court determined that $200 per hour was the more appropriate rate. Both parties have appealed to this Court.

## II

{4} Plaintiff bases her NMHRA sexual harassment claim on a hostile work environment theory. The NMHRA, NMSA 1978, § 28–1–7(A) (2004), provides that "[i]t is an unlawful discriminatory practice for an employer ... to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of ... sex." This language from the NMHRA tracks Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (2000). For this reason, "[w]hen considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA." *Ocana v. Am. Furniture Co.*, 2004–NMSC–

018, ¶ 23, 135 N.M. 539, 91 P.3d 58; *see also Smith v. FDC Corp.,* 109 N.M. 514, 517, 787 P.2d 433, 436 (1990).

{5} The United States Supreme Court has interpreted the phrase "compensation, terms, conditions or privileges" in Title VII as prohibiting *inter alia* discriminatory conduct by employers that "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Meritor Savs. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (quoting 29 CFR § 1604.11(a)(3) (1985)). Recently, in *Ocana,* we gave the same interpretation to the NMHRA: "sexual harassment is actionable under a hostile work environment theory when the offensive conduct becomes so severe and pervasive that it alters the conditions of employment in such a manner that the workplace is transformed into a hostile and abusive environment for the employee." 2004–NMSC–018, ¶ 24, 135 N.M. 539, 91 P.3d 58.

■ {6} The elements of a hostile work environment claim against an employer have generally been stated as:

■ the employee was subjected to unwelcome sexual harassment;

■ the harassment occurred because of the employee's sex;

■ the harassment was sufficiently severe or pervasive to create an abusive work environment affecting a term, condition, or privilege of employment, and;

■ the employer knew, or should have known, of the harassment and failed to take remedial action.

Lawrence Solotoff & Henry S. Kramer, *Sex Discrimination and Sexual Harassment in the Work Place* § 3.04[2], at 3–31 (2004). The discriminatory conduct does not have to be overtly sexual in order to constitute harassment; rather, a hostile work environment claim may arise from disparate treatment on the basis of sex. *See Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80–81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (noting that a hostile work environment claim could be established by "direct comparative

evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace"); *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1261 (10th Cir.1998) ("[A]ctionable conduct is not limited to behavior motivated by sexual desire."). With these general principles in mind, we turn to the specific issues raised by this appeal.

**A**

■ {7} The first issue we address involves the instructions given by the trial court to the jury. The jury was instructed on each element of Plaintiff's hostile work environment claim; however, Defendant argues that the jury was improperly instructed that it need only find that "plaintiff's sex was a motivating factor in the treatment of the plaintiff" and that Plaintiff was "not required to prove that her sex was the Defendant City of Santa Fe's sole motivation or even the primary motivation." Defendant argues that instead, the jury should have been instructed that any harassment was "because of her sex" and the harassment would not have occurred "but for" the complainant's sex. While not quite stated in these terms, Defendant appears to be arguing that Plaintiff's sex must have been either the sole or primary motivation for any harassment. Thus, we must consider whether the mixed-motives instruction given to the jury in this case was appropriate.

{8} Turning to federal law for guidance on this issue, we note that Congress has recognized that there are often multiple causes for adverse employment actions. Title VII, 42 U.S.C. § 2000e–2(m) provides that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a *motivating factor* for any employment practice, even though other factors also motivated the practice." (Emphasis added). Thus, it appears under federal law that an employee is not required to prove that his or her sex was the sole or primary motivation for the suffered harassment. The employee must only establish that the adverse employment action was motivated in part by an illegitimate factor, such as sex.

{9} The NMHRA does not have a comparable provision to 42 U.S.C. § 2000e–2(m); however, we did recently note that the purpose behind the NMHRA is to prohibit all forms of employment sexual harassment. *Ocana,* 2004–NMSC–018, ¶ 23, 135 N.M. 539, 91 P.3d 58. Given this purpose, we believe the Legislature did not intend for an employer to be relieved from an otherwise valid hostile work environment claim simply because other factors aside from sex contributed to making the employee's work environment hostile and abusive. *Cf.* Dan B. Dobbs, *The Law of Torts* § 171, at 416 (2001) ("It would be a windfall to the negligent defendants if they were to escape liability for the harm merely because another tortfeasor's negligence was also sufficient to cause the same harm."). We hold that the mixed-motives jury instruction given in this case was not erroneous. We now turn to Defendant's next argument, whether there was substantial evidence to support the jury's verdict.

**B**

{10} In reviewing the jury verdict for substantial evidence, "we examine the record for relevant evidence such that 'a reasonable mind might accept as adequate to support a conclusion.' " *Smith,* 109 N.M. at 519, 787 P.2d at 438 (quoting *Toltec Int'l, Inc. v. Village of Ruidoso,* 95 N.M. 82, 84, 619 P.2d 186, 188 (1980)). "We resolve disputed facts in favor of the party prevailing below, indulging all reasonable inferences in favor of the verdict and disregarding contrary inferences, and we do not independently weigh conflicting evidence." *Id.* Defendant argues that the jury verdict for Plaintiff must be reversed because there was neither substantial evidence that the harassment was "because of" Plaintiff's sex nor substantial evidence that the harassment was sufficiently severe or pervasive to support a hostile work environment claim.

{11} As for whether there was sufficient evidence the harassment was "because of" Plaintiff's sex, a review of the record reveals that numerous witnesses at trial testified that Sgt. Gallegos treated the female officers differently from the way he treated the male officers. Plaintiff testified that Sgt. Gallegos would ask for the locations of women officers but not the locations of the male officers. Male officers were relieved by Sgt. Gallegos from standing post at crime scenes, even when they had been at their posts less time than Plaintiff. Sgt. Gallegos would collect the reports of male officers a couple of hours before their shift was over, but he would not collect Plaintiff's reports until the end, or sometimes even after, her shift.

{12} A number of other employees of the Santa Fe police department testified that Sgt. Gallegos treated female officers differently from their male counterparts. Jeanette Sandoval, a dispatcher, testified that Sgt. Gallegos tended to monitor the whereabouts of female officers more than he did male officers. He also tried to keep female officers busier by reassigning to them calls initially assigned to male officers. Officer Sandra Gomez testified that Sgt. Gallegos made the environment "a nightmare" for female officers. More specifically, she testified that Sgt. Gallegos was always spying on female officers. Along those same lines, Officer Genevieve Lawson testified that the female officers were monitored more closely by Sgt. Gallegos than the male officers. She was assigned a larger workload than her male co-workers. Officer Della Murray testified that Sgt. Gallegos made snide comments when she was late for briefings but would refrain from making such comments when male officers were late. Sgt. Gallegos would make her get into his car to drop off reports, whereas the men would pull up beside his car and pass the reports through the window. Sgt. Gallegos would at times cancel backup for female officers. Even a male officer, Detective Matthew Trujillo, testified to Sgt. Gallegos' disparate treatment of female and male officers. He testified that Sgt. Gallegos would actively check dispatch to see where female officers were at any given time, and he would reassign calls from male officers to female officers. Based on the foregoing, there was substantial evidence to support a jury finding that any harassment Plaintiff suffered from Sgt. Gallegos was "because of" her sex.

{13} We next consider whether there was sufficient evidence that the harassment

was sufficiently severe or pervasive to alter a term, condition, or privilege of employment. In *Ocana,* we stated:

> In determining whether there was an abusive or hostile work environment, courts must look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."

2004–NMSC–018, ¶ 24, 135 N.M. 539, 91 P.3d 58 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). Alternatively, "[a] recurring point in [the United States Supreme Court's Title VII] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (citation and internal quotation marks omitted). Defendant claims that any harassment in this case was not sufficiently severe and pervasive to support the jury's verdict.

{14} Plaintiff testified to a number of incidents of harassment. She testified that Sgt. Gallegos would check her location more than other officers. He would raise his voice to her over the radio. He would allow male officers to leave their shift early if they missed their lunch, while not extending the same offer to her. She testified that on one occasion Sgt. Gallegos did not relieve her from her post at a crime scene when she had been there for five hours, but he relieved male officers who had not been at the scene as long. Sgt. Gallegos would follow Plaintiff to her house and then monitor how long she took on bathroom breaks. He would assign specific calls to her, especially rape calls, even though other officers were closer to the crime scene. He would not collect her reports until the end of her shift, or sometimes after her shift had ended, whereas he would collect other officers' reports a few hours prior to the end of their shifts. At one briefing, he told the officers to clean out their files and then threw a file at Plaintiff. Plain-

tiff emphasized that these were merely examples of the ongoing harassment she received from Sgt. Gallegos for nineteen months.

{15} Each incident to which Plaintiff testified, when viewed in isolation, may not have been severe enough to support a hostile work environment claim. However, in their aggregate, the incidents reflect the severity and pervasiveness of the harassment. This is especially true considering the harassment was almost daily for a period of nineteen months. Thus, under the totality of the circumstances, we hold that a reasonable jury could conclude that the harassment was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment. We now turn to Plaintiff's arguments on cross-appeal.

## C

{16} Plaintiff first argues that the trial court erred by reducing through remittitur the jury's verdict in her favor from $285,000 to $90,250. In *Allsup's Convenience Stores, Inc. v. North River Ins. Co.,* 1999–NMSC–006, 127 N.M. 1, 976 P.2d 1, we set forth the analytical framework for reviewing the grant of a remittitur. We stated:

> The trial judge . . . has *limited* superintendence when ordering a remittitur in that the exercise of such discretion must be supported by express reasons, and those reasons must establish the presence of passion, prejudice, partiality, sympathy, undue influence or some corrupt cause or motive. . . .[W]here the trial court sets forth certain reasons for which the appellant asserts there is a lack of support in the record, the burden then shifts to the appellee to show that the trial court was correct.

*Id.* ¶ 19 (quotation marks and internal citations omitted). Additionally, we note that remittitur is appropriate in NMHRA cases if the jury intended to punish the defendant. *See Gandy v. Wal–Mart Stores, Inc.,* 117 N.M. 441, 443, 872 P.2d 859, 861 (1994) (holding that punitive damages may not be recovered under the NMHRA).

{17} In justifying remittitur in this case, the trial judge stated that he believed the jury's verdict was based upon either sympathy or an improper motive to punish Defendant. He believed this because: (1) Plaintiff was not fired, demoted, suspended, or disciplined; (2) Plaintiff presented no evidence of concrete special damages; (3) Plaintiff received no professional mental health care; (4) the discrimination was limited to a nineteen-month period; and (5) Plaintiff received two-and-a-half times the amount requested in her closing argument. Thus, in this case, the trial judge expressly stated his reasons for granting remittitur. The specific issue raised by Plaintiff on appeal is whether those reasons established that the the jury's award was influenced by either sympathy or an impermissible motive to punish Defendant.

{18} At trial, Plaintiff presented no evidence of concrete damages, such as counseling expenses or lost time from work. Instead, Plaintiff argued that the jury should award damages equivalent to Plaintiff's salary during the time of harassment, or at the very least nominal damages. These requested damages appear to be based on the emotional distress that she experienced while working under Sgt. Gallegos. The jury, however, awarded Plaintiff damages in an amount equal to Plaintiff's salary for five years: $285,000. While a plaintiff's request for damages certainly does not create a ceiling on a jury's award, the plaintiff is nonetheless in the best position to evaluate the true extent of his or her damages.

{19} Furthermore, the record contains no evidence indicating that Plaintiff was entitled to damages greater than those requested. There was testimony at trial that due to the harassment she suffered, Plaintiff was distressed, depressed, and often resigned to tears. While we agree that this evidence was sufficient to support a damages award for emotional distress, the evidence was not sufficient to support an award of $285,000. *Cf. Wulf v. City of Wichita,* 883 F.2d 842, 874–75 (10th Cir.1989) (holding that an award of $250,000 for mental anguish and distress was grossly excessive). Plaintiff did not present any evidence that she ever sought counseling for this emotional distress. She presented no evidence that she was physically harmed. At all times she remained an officer in good standing. Thus, we agree with the Fourth Circuit Court of Appeals, which when faced with similar facts stated that, "[s]imply put, the jury was presented with insufficient evidence to place a high dollar value on plaintiff's emotional harm." *Hetzel v. County of Prince William,* 89 F.3d 169, 172 (4th Cir.1996) (quotation marks and quoted authority omitted).

{20} Based on the foregoing, we hold that Defendant has met its burden in showing that remittitur was appropriate. The jury's award in this case was "so unrelated to the injury and actual damages proven as to plainly manifest passion and prejudice rather than reason or justice." *Coates v. Wal–Mart Stores, Inc.,* 1999–NMSC–013, ¶ 53, 127 N.M. 47, 976 P.2d 999 (quotation marks and quoted authority omitted). Thus, the trial court appropriately granted Defendant's motion for remittitur. We now turn to Plaintiff's argument that the trial court erred in denying her post-judgment interest on the verdict.

**D**

{21} Plaintiff claims she is entitled to post-judgment interest, pursuant to NMSA 1978, § 56–8–4 (1993, prior to 2004 amendment). Subsection A of that statute provides for mandatory post-judgment interest; however, subsection D of the same statute states "[t]he state and its political subdivisions are exempt from the provisions of this section except as otherwise provided by statute or common law." Plaintiff argues that the NMHRA provides for post-judgment interest. Section 28–1–13(D) provides that "[i]n any action or proceeding under this section if the complainant prevails, the court in its discretion may allow actual damages and reasonable attorney's fees, and *the state shall be liable the same as a private person.*" (Emphasis added). Specifically, Plaintiff argues that since a private party is responsible for post-judgment interest, government entities should likewise be responsible for post-judgment interest.

{22} In *Gonzales v. New Mexico Dep't of Health,* 2000–NMSC–029, ¶¶ 37–38, 129 N.M. 586, 11 P.3d 550, we rejected a similar argu-

ment. In that case, the plaintiff argued that Section 28–1–13(D) is a statutory exception to Section 56–8–4(A) that requires state entities to pay interest on judgments for violations of the NMHRA. Our reasoning for rejecting the argument was two-fold. First, we stated that any interest award under Section 56–8–4 is discretionary. *Gonzales,* 2000–NMSC–029, ¶ 38, 129 N.M. 586, 11 P.3d 550. As the Court of Appeals later noted, this statement was not entirely accurate: while an award of pre-judgment interest under Section 56–8–4(B) is discretionary, an award of post-judgment interest under Section 56–8–4(A) is mandatory. *Weststar Mortg. Corp. v. Jackson,* 2002–NMCA–009, ¶ 55, 131 N.M. 493, 39 P.3d 710, *rev'd on other grounds,* 2003–NMSC–002, 133 N.M. 114, 61 P.3d 823. In this case, we are addressing post-judgment interest. Nonetheless, the second reason we advanced for our holding in *Gonzales* remains valid—"Section 28–1–13(D) makes no mention of the assessment of interest, and [the plaintiff] has offered no authority suggesting that the phrase 'actual damages and reasonable attorney's fees' should be expanded to include interest." 2000–NMSC–029, ¶ 38, 129 N.M. 586, 11 P.3d 550.

{23} Furthermore, the result we reached in *Gonzales* is consistent with the analysis we set forth in *Trujillo v. City of Albuquerque,* 1998–NMSC–031, 125 N.M. 721, 965 P.2d 305. The plaintiffs in *Trujillo* claimed they were entitled to post-judgment interest against the City of Albuquerque for claims made under the Tort Claims Act (TCA). The relevant statute considered in that case, NMSA 1978, § 41–4–19(B) (1991, prior to 2004 amendment), provides that judgment against a government entity under the TCA could not include an award for pre-judgment interest. The plaintiffs argued that by excluding post-judgment interest from the scope of Section 41–4–19(B) the Legislature must have intended to allow recovery of post-judgment interest. We rejected that argument on the basis that Section 41–4–19(B) "does not expressly state that the immunity provided to the [S]tate and its political subdivisions for post-judgment interest is waived under the TCA." *Trujillo,* 1998–NMSC–031, ¶ 47, 125 N.M. 721, 965 P.2d 305. In this

case, Plaintiff is not entitled to post-judgment interest for her claim under the NMHRA because Section 28–1–13(D) does not explicitly waive the State's immunity from post-judgment interest. Therefore, we affirm the trial court on this issue. We now turn to Plaintiff's final argument that the trial court erred by reducing her attorney's requested statutory fees.

### E

{24} Section 28–1–13(D) provides that "[i]n any action or proceeding under [the NMHRA] if the complainant prevails, the court in its discretion may allow actual damages and reasonable attorney's fees." The district court should consider the following factors when setting attorney's fees:

> (1) the time and effort required, considering the complexity of the issues and the skill required; (2) the customary fee in the area for similar services; (3) the results obtained and the amount of the controversy; (4) time limitations; and (5) the ability, experience, and reputation of the attorney performing the services.

*Smith,* 109 N.M. at 522, 787 P.2d at 441. "We review the award of attorney's fees for abuse of discretion." *Gonzales,* 2000–NMSC–029, ¶ 35, 129 N.M. 586, 11 P.3d 550.

{25} In this case, Plaintiff's attorney sought fees at a rate of $230 per hour for 450.96 hours plus applicable gross tax receipts, which resulted in a requested total of $110,657.13. In support of his requested hourly rate, he submitted affidavits from other attorneys who had been awarded similar rates in previous cases. The trial court judge did not cut the number of hours Plaintiff's attorney claimed and actually added five hours to the total for the attorney's preparation in connection with Plaintiff's motions for fees, costs, and interest. The judge then determined that in his experience $200 per hour was "the appropriate and reasonable hourly rate." This ultimately resulted in an award for attorney's fees of $97,290.47, which was approximately 34% of the total judgment rendered by the jury and was actually greater than the judgment following remittitur. We cannot conclude under the facts of this

case that the trial court abused its discretion in its award of statutory attorney's fees. *See Lucero v. Aladdin Beauty Colleges,* 117 N.M. 269, 271–72, 871 P.2d 365, 367–68 (1994). We affirm the trial court on this issue.

### III

{26} Regarding the issues raised by Defendant's appeal, we hold that the trial court did not err in its instructions to the jury and that there was substantial evidence to support the jury's verdict on liability. As for the issues raised by Plaintiff's cross-appeal, we hold that the trial court did not err by granting remittitur, that Plaintiff was not entitled to post-judgment interest, and that the trial court did not abuse its discretion in setting Plaintiff's attorney's fees. We therefore affirm the trial court on all issues raised in this appeal and cross-appeal.

{27} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PATRICIO M. SERNA, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.