2008-NMCA-012

177 P.3d 1080

**Patricia LITTELL, Plaintiff–Appellee,**

v.

**ALLSTATE INSURANCE COMPANY, Defendant–Appellant.**

No. 26,268.

Court of Appeals of New Mexico.

Nov. 21, 2007.

Law Offices of Daniel J. O'Friel, Ltd., Pierre Levy, Michael Schwarz, Santa Fe, NM, for Appellee.

Modrall, Sperling, Roehl, Harris & Sisk, P.A., Timothy C. Holm, Jennifer A. Noya, Albuquerque, NM, for Appellant.

## OPINION

FRY, Judge.

{1} Defendant Allstate Insurance Co. appeals from a judgment on a jury verdict in favor of Plaintiff Patricia Littell on her claims of hostile work environment sexual harassment and retaliatory constructive discharge. Allstate argues that: (1) the district court abused its discretion in admitting certain evidence; (2) there was no evidence supporting either of Plaintiff's claims or the jury's award of compensatory damages for alleged emotional injuries; (3) the issue of punitive damages should not have been submitted to the jury; and (4) the award of punitive damages manifested the influence of passion and prejudice and, therefore, violates due process. We affirm. We also remand to the district court the issue of whether Plaintiff is entitled to an award of attorney fees for this appeal.

### BACKGROUND

{2} Plaintiff began work as a paralegal in Allstate's Albuquerque Staff Counsel Office in 1996. In October 1998, Todd Aakhus joined the office as lead counsel. At this point, according to Plaintiff, conditions at the office changed. Aakhus regularly made sexual innuendoes and told dirty jokes that were demeaning to women. Aakhus allegedly engaged in sexual discussions and flirted with female employees, inappropriately touched female employees, commented about other employees' sexual preferences, and tolerated similar conduct by other office employees. When Plaintiff reported these occurrences anonymously to Allstate's hotline for employment disputes, Allstate investigated, but Plaintiff did not feel that Allstate did anything to resolve the situation. Also according to Plaintiff, Aakhus began treating her differently after she complained to the Allstate hotline. He became more aggressive,

disciplined Plaintiff for pretextual reasons, and berated and belittled her publicly. Ultimately, when Aakhus refused to give Plaintiff a leave of absence so that she could deal with a "family crisis," Plaintiff resigned.

{3} Plaintiff sued Allstate and asserted claims for violations of the New Mexico Human Rights Act, intentional infliction of emotional distress, prima facie tort, retaliatory discharge, and punitive damages. The district court entered summary judgment in favor of Allstate on Plaintiff's claim for intentional infliction of emotional distress and on her claim under the Human Rights Act to the extent it was predicated on retaliation. The case went to trial before a jury, and at the close of Plaintiff's evidence, the district court granted judgment as a matter of law in favor of Allstate on Plaintiff's claim for prima facie tort. After deliberating, the jury returned a verdict in favor of Plaintiff on her claims of hostile work environment sexual harassment and retaliatory discharge. The jury awarded Plaintiff $360,000 in compensatory damages and $1 million in punitive damages. The district court denied Allstate's subsequent motion for judgment notwithstanding the verdict or, in the alternative, for remittitur or a new trial. This appeal followed. We provide additional facts in our discussion.

## DISCUSSION

{4} Allstate makes the following arguments on appeal: (1) the district court abused its discretion by admitting evidence of incidents of which Plaintiff was not aware, of Allstate's discipline of Aakhus, and of other matters that occurred after Plaintiff left Allstate's employ; (2) there was no evidence supporting the jury's determinations (a) that Allstate violated the Human Rights Act by allowing a hostile work environment to exist in the office, (b) that Allstate subjected Plaintiff to retaliatory constructive discharge, and (c) that Plaintiff was entitled to compensatory damages for alleged emotional injuries in the amount of $200,000 to $250,000; (3) the district court should not have allowed the issue of punitive damages to go to the jury because (a) Aakhus was not acting in a managerial capacity or in the scope of employment and (b) Allstate did not authorize, ratify, or

participate in Aakhus's misconduct; and (4) the punitive damages award manifested the influence of passion and prejudice, was excessive, and violates due process. We address each argument in turn.

## I. The District Court Did Not Abuse Its Discretion in Admitting Evidence

{5} Allstate argues that the district court abused its discretion in admitting two categories of evidence, including: (1) testimony about incidents that Plaintiff was not aware of, and (2) evidence of matters that postdated Plaintiff's employment with Allstate, including Allstate's disciplining and discharge of Aakhus. We review the district court's admission of evidence for abuse of discretion, *Coates v. Wal–Mart Stores, Inc.*, 1999–NMSC–013, ¶ 36, 127 N.M. 47, 976 P.2d 999, and conclude that the district court's admission of this evidence was within the sound exercise of its discretion.

### A. Incidents of Which Plaintiff Was Purportedly Not Aware

{6} Allstate contends that the only evidence admissible on Plaintiff's claim of sexual harassment was evidence regarding incidents of which Plaintiff was aware or made aware during her employment. Allstate further argues that Plaintiff failed to lay a foundation that she was aware of several incidents about which fellow employees Maureen Reed and Margie Lang testified. These incidents included Reed's testimony that Aakhus reported a story in the office concerning a physician putting his hand in a woman's vagina, Reed's testimony regarding a twenty-minute discussion at lunch about a female attorney's breasts, Reed's testimony that a female attorney in the office would squat in her office "with her crotch open to the area," Lang's testimony that Aakhus gave her a book of erotica, and Lang's testimony about a staff meeting at which a female attorney discussed her breasts.

{7} We agree with Allstate that there is case law supporting the view that Plaintiff could rely only on evidence relating to harassment of which she was aware during the time of her employment. *See Hirase–Doi v. U.S. W. Commc'ns, Inc.*, 61 F.3d 777,

782 (10th Cir.1995) (explaining that the plaintiff in a hostile environment sexual harassment suit under Title VII "may only rely on evidence relating to harassment of which she was aware during the time that she was allegedly subject to a hostile work environment"). Consistent with this view, the district court ruled that evidence of events not witnessed by Plaintiff would be admitted if the events "occurred prior to the time of [Plaintiff's] departure, which she learned of essentially contemporaneously." Our review of the trial transcript establishes that sufficient foundation was laid for introduction of the specified testimony.

{8} Reed testified that Plaintiff "knew about" Aakhus's story regarding the doctor putting his hand in a woman's vagina, and that Plaintiff was probably at the lunch where the female attorney talked about her breasts. Lang testified that she told Plaintiff about the book of erotica Aakhus had given her, and that she was sure that Plaintiff was made aware of the staff meeting where the female attorney discussed her breasts. Given this foundational testimony, we cannot say that the district court abused its discretion in admitting the evidence.

## B. Evidence of Matters Postdating Plaintiff's Employment with Allstate

{9} Allstate also contends the district court should have excluded evidence of events that occurred after Plaintiff resigned. That evidence consisted of a complaint to Allstate management about Aakhus, Allstate's subsequent investigation of that complaint, and Allstate's disciplining and discharge of Aakhus. Allstate maintains this evidence was inadmissible under Rule 11–407 NMRA. This rule provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control or feasibility of precau-

tionary measures, if controverted, or impeachment.

*Id.* Allstate further relies on *Spina v. Forest Preserve of Cook County,* No. 98 C 1393, 2001 WL 1491524 (N.D.Ill. Nov.23, 2001) (mem. and order), in which a federal district court, citing Federal Rule of Evidence 407, excluded evidence of the defendant employer's disciplinary actions against the alleged perpetrators of sexual harassment against the plaintiff. *Id.* at *11. We are not persuaded that Rule 11–407 mandated exclusion of this evidence.

{10} Plaintiff offered evidence of post-resignation events for a purpose other than to prove negligence or culpable conduct. Plaintiff argued to the district court that this evidence was relevant to show that Allstate management did nothing substantive in response to Plaintiff's and other employees' complaints of sexual harassment by Aakhus and to show Allstate's state of mind for purposes of punitive damages. The district court agreed with Plaintiff and further noted that the evidence was relevant to Allstate's affirmative defense that it "exercised reasonable care to prevent and correct promptly any sexual harassment in the workplace." Consequently, the evidence fell within the exception contained in the second sentence of Rule 11–407. *See* 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5290, at 148–49 (1980) ("The list of permissible uses in Rule 407 is illustrative, not exclusive; evidence of subsequent repairs may be admitted for any purpose that does not require an inference to the negligence or culpable conduct of the repairer, whether as an ultimate fact or intermediate inference." (footnotes omitted)).

{11} In addition, we do not consider *Spina* to be persuasive authority. Although the federal district court in that case excluded evidence of the suspension of the plaintiff's superiors, it did so without any significant analysis and in reliance on *Wanke v. Lynn's Transportation Co.,* 836 F.Supp. 587, 595 (N.D.Ind.1993) (mem. and order), which was a wrongful death case, not an employment discrimination case. *See Spina,* 2001 WL 1491524, at *11. We are similarly unpersuaded by the other cases upon which All-

state relies. *Maddox v. City of Los Angeles,* 792 F.2d 1408, 1417 (9th Cir.1986), like *Wanke,* did not analyze the issue. *Hull v. Chevron U.S.A., Inc.,* 812 F.2d 584, 587 (10th Cir.1987), was a personal injury action, in which the policy reasons for excluding subsequent remedial measures (i.e., to encourage the undertaking of measures that enhance safety, *see Couch v. Astec Industries, Inc.,* 2002–NMCA–084, ¶ 26, 132 N.M. 631, 53 P.3d 398) have primary significance. In *Jumper v. Yellow Corp.,* 176 F.R.D. 282, 285 (N.D.Ill. 1997) (mem. and order), the federal district court reserved judgment on whether the subsequent measures would be admissible at trial.

{12} We therefore conclude that the district court did not abuse its discretion in admitting evidence of events that occurred after Plaintiff resigned her position.

**II. There Was Substantial Evidence to Support Plaintiff's Claims of Hostile Work Environment and Retaliatory Constructive Discharge, and to Support the Jury's Award of Compensatory Damages**

■ {13} Allstate argues that there was no evidence supporting Plaintiff's claims of hostile work environment sexual harassment and retaliatory discharge, and that there was insufficient evidence justifying the jury's award of compensatory damages for Plaintiff's emotional distress. "In reviewing a sufficiency of the evidence claim, this Court views the evidence in a light most favorable to the prevailing party and disregard[s] any inferences and evidence to the contrary." *Weidler v. Big J Enters., Inc.,* 1998–NMCA–021, ¶ 30, 124 N.M. 591, 953 P.2d 1089 (alteration in original) (internal quotation marks and citations omitted). We defer to the jury's determination regarding the credibility of witnesses and the reconciliation of inconsistent or contradictory evidence. *Id.* "We simply review the evidence to determine whether there is evidence that a reasonable mind would find adequate to support a conclusion." *Id.* We reject Allstate's contention that the "clearly erroneous" standard of review, which is employed by the federal courts, applies in this state court action. *See*

*Bovee v. State Highway & Transp. Dep't,* 2003–NMCA–025, ¶ 17, 133 N.M. 519, 65 P.3d 254.

**A. Hostile Work Environment**

■ {14} Allstate contends that Plaintiff failed to introduce evidence on the claim of hostile work environment that Aakhus's conduct rose to the level of extreme offensiveness required by the applicable law. Allstate maintains that Plaintiff's evidence demonstrated nothing more than "a smattering of incidents" that occurred over Plaintiff's three-year employment in the office.

{15} Our Supreme Court, interpreting the New Mexico Human Rights Act, NMSA 1978, §§ 28–1–1 to–14 (1969, as amended through 2007), established what constitutes sexual harassment under a hostile work environment theory in *Ocana v. American Furniture Co.,* 2004–NMSC–018, 135 N.M. 539, 91 P.3d 58. Analogizing to federal law regarding a similar cause of action under Title VII, the Court stated that such a claim "is actionable ... when the offensive conduct becomes so severe and pervasive that it alters the conditions of employment in such a manner that the workplace is transformed into a hostile and abusive environment for the employee." *Id.* ¶ 24, 135 N.M. 539, 91 P.3d 58. The fact finder

> must look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The work environment must be both objectively and subjectively offensive—one that a reasonable person would find hostile or abusive and one that the employee did perceive as being hostile or abusive.

*Id.* (internal quotation marks and citation omitted). In the present case, the district court instructed the jury in accordance with *Ocana.*

{16} Plaintiff introduced the following evidence in support of her claim. Plaintiff testified that she was very happy working for Allstate and that there were no discussions of sex or foul language in the office prior to the

hiring of Aakhus. However, things changed when Aakhus was hired in October 1998. On his second day in the office, Aakhus came into Plaintiff's office, got physically very close to her, and, using profanity, told her a joke about President Clinton, Monica Lewinsky, and oral sex. Plaintiff said she felt shocked and "absolutely terrified" because the joke was so demeaning to women. The next day Plaintiff told Aakhus she did not want him to tell her that kind of joke again and that what he had done was against Allstate policy.

{17} Plaintiff testified that, while Aakhus never told her a joke again, the sexual behavior never stopped, and Aakhus continued to tell dirty jokes in Plaintiff's presence over the next three years and four months. This behavior occurred almost daily. Most often, the jokes, which were both written and oral, were demeaning to women and frequently referred to sex acts. Aakhus used profanity and made comments about male and female genitalia. At Halloween, Aakhus commented that a witch on a broomstick looked as if she must be male and referred to the broomstick as a male body part. Aakhus also frequently followed Plaintiff closely, pointing at Plaintiff and berating her in public. Although he did not actually touch her, Plaintiff felt assaulted. Aakhus frequently "flip[ped] people off." Once, Aakhus referred to a news reporter as "Dicks Sniffing" and this offended Plaintiff. In addition, Aakhus frequently used the phrase "bite me."

{18} In 1999 Plaintiff complained to Allstate's Resolution Line, which is a hotline for Allstate employees to use to complain anonymously about their job-related concerns. An employee would complain, the complaint would be investigated, and the people investigating would get back to the complaining employee. Soon thereafter other employees began to complain about Aakhus's sexual jokes and comments. A secretary in the office, Lou Wise, told Plaintiff that Aakhus had said that Wise's daughters must be homosexual because they were not married, and this offended Wise.

{19} Plaintiff became more stressed and tried to avoid being alone with Aakhus, and she observed other employees changing their behavior as well. For example, Plaintiff and Wise, who often worked after 5:00, agreed that neither would leave the other alone and that they would stay until both could leave at the same time. Meanwhile, Plaintiff had received nothing in writing regarding her complaint to the Resolution Line. Several times, she called Allstate's employee assistance program, which provided confidential counseling to employees.

{20} Aakhus became more aggressive and gradually more temperamental. Going into 2000, Aakhus's sexual innuendoes and aggressiveness escalated. Employee complaints to the Resolution Line continued. People from Allstate's human resources department showed up at the office, and Plaintiff tried to communicate to them her understanding of the office atmosphere. Plaintiff was still frightened. Every time she called the Resolution Line, she was told to call back, and when she called back, she was told either that the matter was still under investigation or that the case was closed and to call someone else for further assistance. Plaintiff just wanted Aakhus to stop his behavior, but he would not, and no one at Allstate would make him stop.

{21} In 2000, there were several new hires in the office, including a new paralegal and a new secretary. Plaintiff noticed Aakhus flirting with the paralegal, and the two engaged in sexual discussions and told sexual jokes. The new secretary would touch Aakhus at meetings, and the two would leave the office together, which Plaintiff found demeaning and embarrassing. Two of the female employees discussed explicit details of the sexual acts required to conceive babies, the best time of the month to get pregnant, and said they would be meeting their spouses on company time to try to conceive, noting that their return to the office would be delayed because they would have to elevate their legs. Aakhus participated in these discussions, and he used a rubber chicken to demonstrate elevation of the legs. Several of the female employees, "who played along with [Aakhus's] sexualization of the office," dressed provocatively, displaying cleavage and wearing short, tight skirts.

{22} Plaintiff testified that the office was divided between those who engaged with Aakhus in sexual conversation and those who did not. The people who went along with Aakhus received special privileges and came and went as they pleased.

{23} Secretary Lou Wise testified that when she first began working at the office, Aakhus handed her two to three pages that included content that was "of a sexual nature having to do with oral sex." Wise further testified that "[i]t was constant from Todd Aakhus as far as lewd jokes." Every joke Aakhus told was sexual. Due to the open area in the office, Wise could hear Aakhus talking dirty and engaging in sexual banter. After Wise objected to Aakhus, his behavior changed. The episodes of a sexual nature increased and Aakhus would raise his voice so that Wise could hear what he was saying, "which was always of a sexual nature." Plaintiff was aware of all of this having occurred.

{24} Wise observed Aakhus hanging over Plaintiff's desk many times, talking in a very loud voice and pointing his finger at her. Wise observed instances of Aakhus's physical presence being very close to Plaintiff, and she saw Aakhus following Plaintiff, right on her heels. Aakhus's sexual talk got worse in 2000, and Wise saw Aakhus approach Plaintiff more often. Aakhus's criticism of Plaintiff intensified, and Wise saw Plaintiff crying or on the verge of tears many times. This affected Plaintiff's work because she seemed to be afraid of what Aakhus would do next.

{25} Wise reported Aakhus's behavior several times to Allstate's human resources department and to Larry Vogel, an Allstate attorney in the Denver office who was Aakhus's boss. According to Wise, Allstate "corporate" was aware of what was going on. Despite these reports to Allstate, Aakhus did not stop his behavior.

{26} Maureen Reed, who worked for eleven years as an attorney in Allstate's Albuquerque Staff Counsel Office, testified that Aakhus got sexual jokes off the Internet and passed them around to people in the office. Everyone was very shocked and upset by this, and this information was imparted to Plaintiff. Reed said that Aakhus's "sexual references never stopped for the whole time he was there." During team meetings each week, Aakhus made "constant sexual references." Reed reported that "[Aakhus's] thing was talking about sex in front of people. . . . He loved it, couldn't stop himself for some reason. So it was always sex." All of this kind of talk in a professional setting was "demeaning to women." Plaintiff was aware of all of these incidents.

{27} The sex talk continued at office lunches, which generally occurred when Aakhus's boss, Larry Vogel, was present. Reed heard a female attorney talk about her breasts for twenty minutes at one of these office lunches attended by Vogel. Reed thought Plaintiff was probably at this lunch. Reed also recalled that at a team meeting, one of the female attorneys said she had to go get medicine for her "ta-ta."

{28} Reed described the unprofessional conduct she observed, including "sexualizing the office, constant references to sex, either by innuendo, jokes that you tell, jokes that you pass out." Aakhus once told her a story that included "graphic detail about some doctor on the [witness] stand testifying about putting his hand up into some woman's vagina, in graphic detail." Plaintiff knew about this story.

{29} Allstate's human resources department came to the office, and Reed participated in at least two of these investigations. Following these investigations, Vogel told the employees that Aakhus "might have a few little problems, . . . but it's the rest of you's [sic] problem, and you need to take care of yourselves." Aakhus then told the employees that they were not to call Vogel, and that he, Aakhus, "could do whatever he wanted." Reed said that this "was horrible and it was frightening." She testified that there was a division in the office between Aakhus's employee friends whom he had hired and the employees who complained about Aakhus. She said that "at times, you could cut the tension with a knife. I mean, it was very tense and very hostile."

{30} Reed further testified that Plaintiff would become very upset when Aakhus was particularly abusive or did something outra-

geous. "[Plaintiff] was, obviously, under a huge amount of stress." By 2001, Aakhus "was totally angry and totally taking his anger out on the people who he believed were complaining." Plaintiff would tell Aakhus when he did something that she did not think was right, and "[t]his made him crazy with her. . . . So he was totally angry and abusive to [Plaintiff]." Reed testified that "[a]s things escalated, [Aakhus] was unreasonably trying to manage [Plaintiff's] time, making false accusations . . . about her work quality." In addition, Aakhus "followed [Plaintiff] around on her heels out in the open area in front of everyone." He would "hang over those dividers, and that's what he would do, yelling at her, with his face bright purple." Reed said "it was totally, totally scary."

{31} Margie Lang, a senior legal assistant in the office at the time, also testified. She said that Aakhus told blonde jokes and sexual jokes, many of which had to do with women. Shortly after Aakhus started working in the office, he gave Lang a book to read. The book was erotica. When she discovered the nature of the book, Lang gave it back to Aakhus. She told Plaintiff about this. Lang also testified that at one of the office's staff meetings, there was a discussion about the breasts of one of the attorneys. Plaintiff was made aware of this after the meeting. Lang believed that Vogel and human resources were aware of the complaints about Aakhus's behavior, but she did not observe a change in Aakhus's behavior.

{32} Exhibits introduced at trial showed that Allstate had first received complaints about Aakhus making "inappropriate, unprofessional and sexual comments in the office" in 2000. Allstate's investigation confirmed the validity of the complaints and Aakhus received formal counseling in August 2000. Plaintiff knew nothing about this. In May 2002, Allstate placed Aakhus on "Job in Jeopardy" status for making such comments. Allstate then discovered in August 2002 that Aakhus had violated the terms of the Job in Jeopardy notice by continuing to make such comments. Allstate terminated Aakhus on October 3, 2002. Then, in December 2002, Allstate rescinded its termination of Aakhus and reinstated him as an employee.

{33} Considering this evidence in the context of the applicable law, we conclude there was sufficient evidence to support Plaintiff's claim of hostile work environment sexual harassment. We evaluate the evidence with reference to the language of the jury instructions given, which constitute the law of the case. *Atler v. Murphy Enters., Inc.*, 2005–NMCA–006, ¶ 13, 136 N.M. 701, 104 P.3d 1092. The testimony of Plaintiff, Wise, Reed, and Lang established that Plaintiff was "subjected to offensive conduct of a sexual nature" and that "the conduct was unwelcome." In addition, the evidence gave rise to a reasonable inference that "the harassment occurred because of [Plaintiff's] sex." Both Plaintiff and Reed testified that Aakhus's sexual commentary was demeaning to women.

{34} The evidence also supported the conclusion that Plaintiff "perceived the working environment to be abusive or hostile" because she testified that Aakhus's conduct caused her to feel "assaulted" and "frightened." As time went by, she became more stressed and avoided being alone with Aakhus. Wise testified that Aakhus's conduct affected Plaintiff's work because she seemed to be afraid of what Aakhus would do next. Reed testified that Plaintiff "was, obviously, under a huge amount of stress." In addition, given Wise's testimony that she reported Aakhus's behavior to Allstate several times, Reed's testimony that "you could cut the tension with a knife" in the office, and all the testimony regarding the frequency of profanity and sex-related conversation, a jury could reasonably conclude that "a reasonable wom[a]n in [Plaintiff's] circumstances would consider the working environment to be abusive or hostile."

{35} Allstate argues that the witnesses' generalized and conclusory testimony that Aakhus's comments "never stopped" and were "constant" is insufficient as a matter of law to establish a hostile work environment. In support, Allstate cites several cases, which we do not find persuasive. For example, the issue in *Woodward v. City of Worland*, 977 F.2d 1392 (10th Cir.1992), was limited to the

question of whether the district court had properly denied the defendants' motion to dismiss on the basis of qualified immunity. *Id.* at 1396. Thus, the court's discussion regarding generalized and conclusory testimony focused on the lack of time-specific evidence tying the alleged harassment to a time when the law was clearly established that sexual harassment violated equal protection rights. *Id.* at 1398. Allstate's reliance on that case is inapposite. The other cases cited by Allstate are equally unpersuasive. *See Miranda v. Wis. Power & Light Co.*, 91 F.3d 1011, 1018 (7th Cir.1996) (affirming summary judgment against the plaintiff because her assertions of a hostile work environment consisted of vague, conclusory allegations); *Ceasar v. N. Star Steel Tex., Inc.*, 69 F.Supp.2d 858, 867 (E.D.Tex.1999) (granting summary judgment against the plaintiff because her allegations constituted only her subjective perception of discrimination and suggested nothing more than a bad working relationship with her superior); *Leskinen v. Utz Quality Foods, Inc.*, 30 F.Supp.2d 530, 533 (D.Md.1998) (granting summary judgment to the defendant because the plaintiff's generalized statements of harassment did not establish that any violations of Title VII occurred within the limitations period).

{36} Allstate contends that there was no evidence that Aakhus's "conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment." In support, Allstate cites to *Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir.1995), where the Seventh Circuit Court of Appeals reversed a jury verdict in favor of the plaintiff on her claim of sexual harassment. In that case, the manager called the plaintiff "pretty girl," made a grunting noise at her, suggested she was "hot," talked about "los[ing] control" around pretty girls, and made a gesture suggesting masturbation. *Id.* at 430. The court stated, "We do not think that these incidents, spread over seven months, could reasonably be thought to add up to sexual harassment." *Id.* The court noted that the manager never touched the plaintiff, never invited her to have sex or a date, and he never threatened her, exposed himself, or showed her a dirty picture. *Id.* at

431. Allstate argues that Aakhus never did any of these things either.

{37} We are not persuaded that this case is like *Baskerville.* The jury in this case was instructed that

> [w]hether the environment constituted a sexually hostile work environment is determined by looking at the totality of the circumstances, including the frequency of the discriminatory conduct, the severity of the conduct, whether the conduct was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance.

There was evidence that Aakhus's profanity and his sex-related comments and jokes occurred almost daily, that it was "constant" and increased over time, that it occurred at office lunches and staff meetings, and that Aakhus became more aggressive as time passed. Plaintiff, Wise, and Reed testified that Aakhus frequently followed Plaintiff close on her heels, pointed his finger at her, and yelled at her "with his face bright purple," and Reed said that Aakhus "was totally angry and abusive" to Plaintiff. Plaintiff testified that Aakhus became critical of her work and that his criticisms were completely unfounded, that Aakhus told her that he knew she had reported him to management, that Aakhus began sabotaging her computer, and that she was operating at an extremely high stress level.

{38} The jury could reasonably consider the totality of these circumstances and conclude that the environment in the office was hostile. *See Nava v. City of Santa Fe*, 2004–NMSC–039, ¶ 15, 136 N.M. 647, 103 P.3d 571 (holding that there was sufficient evidence of harassment even though each incident by itself "may not have been severe enough to support a hostile work environment claim" but "in their aggregate, the incidents reflect[ed] the severity and pervasiveness of the harassment"). While Allstate presented evidence that could be viewed as inconsistent with such a conclusion, "[t]he question is not whether substantial evidence exists to support the opposite result, but rather whether such evidence supports the result reached." *Las Cruces Prof'l Fire Fighters v. City of*

*Las Cruces*, 1997–NMCA–044, ¶ 12, 123 N.M. 329, 940 P.2d 177. We therefore conclude that substantial evidence supported the jury's verdict in favor of Plaintiff on her claim of hostile work environment sexual harassment.

## B. Retaliatory Constructive Discharge

{39} Allstate contends the evidence did not support Plaintiff's claim of retaliatory constructive discharge. It makes two arguments on this issue. First, it argues that Plaintiff was not constructively discharged because a reasonable person in Plaintiff's situation would not have felt compelled to resign. *See Ulibarri v. State*, 2006–NMSC–009, ¶ 14, 139 N.M. 193, 131 P.3d 43 (explaining that in order to show constructive discharge, a plaintiff "must show that the employer made working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign" (internal quotation marks and citation omitted)). Second, Allstate asserts that, even if Plaintiff was constructively discharged, she failed to prove that her discharge was in retaliation for an act she performed that public policy would authorize or encourage.

## 1. Constructive Discharge

■ {40} Allstate maintains that Plaintiff failed to prove constructive discharge. At most, according to Allstate, Plaintiff presented evidence of (1) a hostile work environment, (2) arguably unfair criticism of her work, (3) being forced to relinquish her private office for a carrel, and (4) an unfounded denial of her request for a leave of absence. According to Allstate, this evidence does not rise to the "extraordinary and egregious" level necessary "to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job." *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1026 (1994) (in bank), *overruled on other grounds in Romano v. Rockwell Int'l, Inc.*, 14 Cal.4th 479, 59 Cal.Rptr.2d 20, 926 P.2d 1114 (1996).

{41} Again, we assess the sufficiency of the evidence in the context of the jury in-

structions given. The district court instructed the jury:

> You may consider that [Plaintiff] was constructively discharged from her employment if you find that Defendant Allstate Insurance Company made her working conditions so intolerable, when viewed objectively, that a reasonable person would be compelled to resign, and she had no other choice but to quit.

Our review of the transcript convinces us that the jury could have reasonably found that Allstate constructively discharged Plaintiff.

{42} As discussed previously in this opinion, there was substantial evidence supporting the conclusion that Allstate subjected Plaintiff to hostile work environment sexual harassment consisting of pervasive sexual commentary and innuendo. In addition, there was evidence that Aakhus subjected Plaintiff to aggressive, physically intimidating conduct, such as his frequently following her closely on her heels, pointing his finger at her, and shouting at and berating her in public areas of the office. Plaintiff testified that after she reported Aakhus to Allstate's Resolution Line, Aakhus began criticizing her work and that the criticisms were inaccurate and outrageous. Then, in 2000, after Allstate's human resources department conducted an investigation of the various complaints about Aakhus, he told Plaintiff he knew she had reported him, and he became more aggressive. Plaintiff testified that Aakhus began deleting the "ticklers" on her computer. Ticklers were computerized reminders of deadlines in the various cases handled by the office. In 2001, Aakhus formally disciplined Plaintiff by giving her a "requires improvement" notice. Plaintiff testified that the notice was "absolutely full of false accusations." Notably, the evidence of unfair criticism was not solely Plaintiff's testimony of her subjective views. Several witnesses, including two attorneys who worked closely with Plaintiff, testified that Plaintiff was very competent and her work was excellent.

{43} There was also evidence that Plaintiff and others made many complaints about Aakhus to Allstate, apparently to no avail.

Plaintiff first complained to the Resolution Line in 1999, and others also complained. Plaintiff received no response to her initial complaint indicating that Allstate had looked at the matter, and she was told that the case was closed. She spoke several times with Allstate's employee assistance program to try to figure out how to get Aakhus to stop his behavior. There were many complaints about Aakhus to the Resolution Line in 2000. Ultimately, Allstate sent two people from human resources to the office, and Plaintiff spoke to them. Allstate disciplined Aakhus, but Plaintiff did not know at the time that this had occurred. Every time she called the Resolution Line she was told to call back on a specific date, but when she did so, she was told the matter was still under investigation and to call back.

{44} In May 2001, Aakhus was very agitated and told Plaintiff she had to move out of her office into a work carrel area, even though there was vacant office space. This exposed her to more of the sexual talk and innuendo. In 2002, Plaintiff's father died, and her 95–year–old, infirm grandfather was "crushed." Plaintiff, who believed she had a leave of absence available to her, asked Aakhus for leave, and he denied it. Plaintiff begged Aakhus because she "was at [her] wits' end." She testified that this "was the worst day of [her] professional life" and that she "had absolutely no alternative but to give [her] notice."

{45} Allstate presented evidence that was inconsistent with Plaintiff's testimony. However, "when there is a conflict in the testimony, we defer to the trier of fact." *Buckingham v. Ryan*, 1998–NMCA–012, ¶ 10, 124 N.M. 498, 953 P.2d 33. The jury apparently found Plaintiff's evidence to be more credible than that submitted by Allstate, and we will not second guess that determination.

{46} Allstate analogizes this case to *Gormley v. Coca–Cola Enterprises*, 2005–NMSC–003, 137 N.M. 192, 109 P.3d 280, in which the Court affirmed summary judgment in favor of the defendant on the plaintiff's claim of constructive discharge because the plaintiff failed to show that his working conditions rose to the necessary level. *Id.* ¶ 1, 137 N.M. 192, 109 P.3d 280. The plaintiff based his

claim on criticism of his job performance, loss of overtime, reduction in pay, and loss of a lighter duty position, which the plaintiff contended jeopardized his safety. *Id.* ¶¶ 13, 17, 137 N.M. 192, 109 P.3d 280. The Court held that the plaintiff's claim of criticism was too generalized, in that he had never received any written discipline; that loss of overtime was not material because it did not result in a reduction in base pay; that the reduction in pay was not extreme; and that he failed to provide record support for his claim that his change in duties jeopardized his safety. *Id.* ¶¶ 14–18, 137 N.M. 192, 109 P.3d 280.

{47} We do not agree that the evidence presented in *Gormley* was equivalent to Plaintiff's evidence in the present case. Plaintiff introduced proof establishing hostile work environment sexual harassment and evidence that her supervisor physically intimidated her, sabotaged her computer, and falsely accused her of inadequate work performance. The actions of the plaintiff's employer in *Gormley* were not nearly so egregious.

{48} Allstate's additional arguments on this issue in effect ask us to reweigh the evidence. It cites numerous cases for the propositions that criticism is expected by employees, that denial of leave or movement from an office to a carrel are not egregious enough to constitute constructive discharge, and that giving notice of resignation rather than quitting on the spot demonstrates voluntary termination of employment. We are not persuaded. These contentions are more in the nature of closing argument than legal reasons for concluding that the evidence was insufficient. It is not our role to reweigh the evidence or substitute our judgment for that of the jury. *Id.* Consequently, we conclude that the evidence, when considered in its totality, could have reasonably supported the jury's conclusion that Allstate made Plaintiff's working conditions so intolerable that a reasonable person in her position would have been compelled to resign.

**2. Retaliation for an Act Public Policy Has Authorized or Encouraged**

{49} Allstate argues that, even if Plaintiff proved that she was constructively dis-

charged, she failed to prove that her discharge was in retaliation for an act that public policy has authorized or encouraged. It contends that it is unclear what act Plaintiff claimed was the reason for her discharge, that she failed to prove a causal connection between the act and the discharge, and that there was no retaliation as a matter of law because the district court granted Allstate's pretrial motion for summary judgment on Plaintiff's claim under the Human Rights Act to the extent it was predicated on retaliation. We disagree.

{50} First, the jury instructions provide the answer with respect to Allstate's claim that the evidence did not establish what act of Plaintiff was authorized or encouraged by public policy. The district court instructed the jury that "[i]t is the public policy of the State of New Mexico to prohibit sexual harassment in the work place and to encourage employees to report sexual harassment."

{51} Second, in light of (a) our holding that there was sufficient evidence to support the jury's finding of sexual harassment, (b) Plaintiff's public-policy-sanctioned reporting of that harassment, (c) the evidence that Aakhus indicated that he knew Plaintiff had reported him and that he became more aggressive afterward, and (d) Plaintiff's testimony about what caused her to resign her job, it would be reasonable for the jury to infer that there was a connection between the harassment, the reporting of the harassment, and the discharge.

{52} Third, the district court granted summary judgment to Allstate on Plaintiff's retaliation claims under the version of the Human Rights Act that was in effect at the time because she failed to make her claims within 180 days of each retaliatory act of discipline she alleged. *See* § 28–1–10(A) (1995) (amended 2005) (requiring complaints of unlawful discriminatory practice to be filed with the human rights division within 180 days after the alleged act was committed). When these claims were argued on summary judgment, they did not include the ultimate claim of retaliatory constructive discharge that ripened on February 15. These statutory claims were distinct from Plaintiff's claim

of retaliatory constructive discharge, which is a common law claim. *See Gormley*, 2005–NMSC–003, ¶ 9, 137 N.M. 192, 109 P.3d 280 (explaining that "constructive discharge is a doctrine that permits an employee to recast a resignation as a de facto firing, depending on the circumstances surrounding the employment relationship and the employee's departure"). We fail to see how the untimely filing of specific statutory claims under the Human Rights Act translates into the substantive failure of Plaintiff's claim of retaliatory discharge, and the district court did not rule that the facts surrounding the ultimate retaliatory discharge claim were untimely because that matter was not before it.

## C. Compensatory Damages for Alleged Emotional Injuries

{53} The jury awarded Plaintiff $360,000 in compensatory damages after being instructed that, if it found in favor of Plaintiff, it should calculate the amount of damages by considering:

[ (1) t]he benefits Plaintiff would have earned, less the amount Plaintiff could through exercise of reasonable diligence have earned, in the time made available as a result of the conclusion of her employment with Allstate, from employment of the same quality as her employment with Allstate[,] . . . [and (2) ] an amount of money that will reasonably and fairly compensate her for any emotional distress caused by the violation.

Allstate surmises that the portion of the total damages awarded that is attributable to Plaintiff's economic damages is between $105,000, which was the amount Plaintiff's counsel requested in closing argument as compensation for loss of pension benefits, and $159,349, which was the amount Plaintiff's expert economist testified was the total amount of pension benefits lost. Consequently, Allstate continues, the remaining amount of damages—between $200,651 and $255,000—must be attributable to Plaintiff's emotional injuries. Allstate claims that this amount is excessive and that the district court should have granted remittitur because Plaintiff offered no corroborating evidence in

the form of medical diagnosis or treatment, or in the form of testimony that Plaintiff missed work or looked for another job while Aakhus was employed at Allstate.

{54} Allstate's argument is partly that there was insufficient evidence supporting the damages award, and to that extent we employ the substantial evidence standard of review recited earlier in this opinion. Allstate also argues that the district court should have ordered remittitur.

> In determining whether a jury verdict is excessive, we do not reweigh the evidence but determine whether the verdict is excessive as a matter of law. The jury's verdict is presumed to be correct. When a [district] court denies a motion for a remittitur, we defer to the trial court's judgment.

*Ennis v. Kmart Corp.*, 2001–NMCA–068, ¶ 27, 131 N.M. 32, 33 P.3d 32 (citations omitted).

{55} We first observe that Allstate may be wrong about the amount the jury attributed to Plaintiff's economic damages. Plaintiff's expert economist based the present value of Plaintiff's lost pension on the assumption of a normal life expectancy of age 81. It is possible that the jury concluded that Plaintiff would live longer than age 81.

{56} More importantly, Allstate has not cited any authority for the proposition that a plaintiff's testimony of emotional distress must be corroborated before the plaintiff is entitled to be compensated for such distress. Allstate relies on the *Nava* case to support its position, and points to language in that sexual harassment case emphasizing that the plaintiff had not presented any "evidence of concrete damages, such as counseling expenses or lost time from work." 2004–NMSC–039, ¶ 18, 136 N.M. 647, 103 P.3d 571. However, in that case our Supreme Court was reviewing a district court's order *granting* remittitur. *Id.* ¶ 3, 136 N.M. 647, 103 P.3d 571. The Court properly deferred to the district court's determination, just as we must defer to the district court's *denial* of remittitur in the present case. *See id.* ¶ 20, 136 N.M. 647, 103 P.3d 571.

{57} There was substantial evidence upon which the jury could base an award of damages for emotional distress. Plaintiff and her co-employees testified about the stress Plaintiff suffered as a result of the sexual atmosphere in the office and the conduct of Aakhus. Plaintiff testified that she was frightened for her job, that she feared being alone with Aakhus and took steps to avoid such a scenario, and that Aakhus publicly belittled and berated her. Her co-workers testified that Aakhus sometimes followed Plaintiff closely and yelled at her and that they saw Plaintiff crying or on the verge of tears many times. Aakhus formally disciplined Plaintiff after she complained about him, and several witnesses testified that Plaintiff's work was exemplary.

{58} Allstate has failed to meet its burden of establishing "that the verdict was infected with passion, prejudice, partiality, sympathy, undue influence, or some corrupt cause or motive." *Ennis*, 2001–NMCA–068, ¶ 27, 131 N.M. 32, 33 P.3d 32 (internal quotation marks and citation omitted). We will not reweigh the evidence and substitute our judgment for that of the jury.

### III. The District Court Properly Allowed the Jury to Consider Punitive Damages

{59} Allstate argues that the district court should have granted its motion for directed verdict on the issue of punitive damages because Allstate did not have the culpable mental state that is a prerequisite to an award of such damages. *See Allsup's Convenience Stores, Inc. v. N. River Ins. Co.*, 1999–NMSC–006, ¶ 53, 127 N.M. 1, 976 P.2d 1 (explaining that an award of punitive damages must be based on "a culpable mental state indivisible from the conduct constituting liability" (internal quotation marks omitted)). When we review a district court's ruling on a motion for directed verdict, "any conflicts in the evidence or reasonable interpretations of it are viewed in favor of the party resisting the directed verdict." *Hedicke v. Gunville*, 2003–NMCA–032, ¶ 9, 133 N.M. 335, 62 P.3d 1217. "The sufficiency of evidence presented to support a legal claim or defense is a question of law for the trial

court to decide. This Court reviews questions of law de novo." *Id.* (internal quotation marks and citations omitted).

{60} Allstate advances two sub-arguments: (1) that Allstate cannot be vicariously liable for the acts of Aakhus because Aakhus was not acting within the scope of employment when he was engaged in sexually harassing conduct and because Aakhus was not employed in a managerial capacity; and (2) that Allstate did not authorize, ratify, or participate in Aakhus's misconduct. *See Weidler,* 1998–NMCA–021, ¶ 42, 124 N.M. 591, 953 P.2d 1089 (listing two methods of holding a principal liable for punitive damages: by establishing that "the principal has in some way authorized, ratified, or participated in the wanton, oppressive, malicious, fraudulent, or criminal acts of its agent" or by establishing that "the agent was employed in a managerial capacity and was acting in the scope of his employment" (internal quotation marks and citation omitted) ). We need not address the first sub-argument because we conclude that the evidence supported the view that Allstate authorized, ratified, or participated in Aakhus's misconduct. *See Atler,* 2005–NMCA–006, ¶ 16, 136 N.M. 701, 104 P.3d 1092 ("When the jury instructions provide two alternative bases for awarding punitive damages, we will uphold the jury verdict if there is substantial evidence in the record to support either.").

{61} There was testimony at trial that Aakhus's boss, Larry Vogel, was present for some of the "sex talk" that occurred in the office and apparently did nothing to stop it. Although Allstate reprimanded Aakhus for "unprofessional behavior" in August 2000, the employees in the office did not know this, and it appeared that the reprimand had no effect because Aakhus's behavior never improved. On the contrary, it worsened, despite numerous complaints to Allstate over the three-year period when Plaintiff's employment overlapped with Aakhus's. Indeed, Reed testified that Vogel told employees that Aakhus "might have a few little problems . . . but . . . you need to take care of yourselves." When others in Allstate management wanted to impose additional discipline on Aakhus, Vogel resisted because he did not think there

was sufficient evidence for such discipline and because the Albuquerque office was performing well.

{62} Viewing the reasonable interpretations of this evidence in favor of Plaintiff, *see Hedicke,* 2003–NMCA–032, ¶ 9, 133 N.M. 335, 62 P.3d 1217, we conclude there was sufficient evidence to submit the issue of punitive damages to the jury. We agree with the district court that Vogel's failure to act after observing Aakhus's misconduct firsthand "could constitute authorization, participation in, or ratification. There's also a question for the [j]ury as to whether the disciplinary actions taken were adequate or whether they represent in some way authorization of . . . Aakhus's conduct."

## IV. The Punitive Damages Award Did Not Violate Due Process

{63} Allstate contends the punitive damages award reflects passion and prejudice and, consequently, violates due process. *See Aken v. Plains Elec. Generation & Transmission Coop., Inc.,* 2002–NMSC–021, ¶ 17, 132 N.M. 401, 49 P.3d 662 (explaining that punitive damages awards are reviewed under a de novo standard "as a matter of federal constitutional imperative"). We conduct an independent, de novo assessment of the award. *Id.* ¶ 19, 132 N.M. 401, 49 P.3d 662. In effect, we are reviewing the award for reasonableness. *Chavarria v. Fleetwood Retail Corp.,* 2006–NMSC–046, ¶ 36, 140 N.M. 478, 143 P.3d 717. In undertaking this review we consider three criteria:

(1) the reprehensibility of the defendant's conduct, or the enormity and nature of the wrong; (2) the relationship between the harm suffered and the punitive damages award; and (3) the difference between the punitive damages award and the civil and criminal penalties authorized or imposed in comparable cases.

*Id.*

{64} With respect to the first criterion, the reprehensibility of the conduct, Allstate argues that there was no evidence that Allstate engaged in a pattern of threatening employees with their jobs if they reported sexual harassment, or that Allstate "persist-

ed in a course of conduct after it had been adjudged unlawful on even one occasion, let alone repeat occasions." Our Supreme Court in *Aken* noted that in retaliatory discharge cases "evidence of repeated engagement in prohibited conduct knowing or suspecting it is unlawful is relevant support for a substantial award." 2002–NMSC–021, ¶ 21, 132 N.M. 401, 49 P.3d 662 (internal quotation marks and citation omitted).

{65} Plaintiff presented evidence that, even after Allstate privately reprimanded Aakhus in August 2000 for what it called "unprofessional behavior," Aakhus's misconduct intensified, and employees continued to make complaints to Allstate's Resolution Line and its human resources department. Although Allstate management investigated these complaints, it did nothing further about Aakhus until nearly two years later, in May 2002. There is no question that Allstate knew that sexual harassment, and specifically Aakhus's conduct, was unlawful, because it distributed to its employees a pamphlet stating that "[i]t is [Allstate's] policy to maintain a working environment free from discrimination and sexual advances or harassment which may affect an employee's terms or conditions of employment." That pamphlet cited, as an example of sexual harassment, "[w]ritten material, photos and/or any other items of a sexual nature." Given this and the testimony of various employees that they reported Aakhus's misconduct many times over a period of years, we conclude that the jury reasonably could have found that Allstate demonstrated consciousness of wrongdoing. *See id.* (finding support for award of punitive damages in light of evidence showing that "[the defendant's] behavior exhibited consciousness of wrongdoing"). And, like the Court in *Aken,* "we conclude that a substantial award was necessary to meet the goal of punishing [Allstate] for its conduct and deterring it, and others similarly situated in the future, from engaging in such conduct." *Id.*

{66} As for the second criterion for assessing the reasonableness of the award, the relationship between the harm suffered and the award, we must consider whether the amount of the award is "so unrelated to the injury and actual damages proven as to plain-

ly manifest passion and prejudice rather than reason or justice." *Id.* ¶ 23, 132 N.M. 401, 49 P.3d 662 (internal quotation marks and citation omitted). Although the United States Supreme Court has suggested that due process is most likely satisfied if there is "a single-digit ratio between punitive and compensatory damages," *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the Court has also indicated the need for a flexible approach. *Id.* Here, the ratio of punitive damages to compensatory damages is 3.6 to 1. This is within the range deemed by the Supreme Court to be consistent with due process. *See id.*

{67} Allstate contends that the punitive damages award is in some ways duplicative of the compensatory damages awarded for emotional distress because both awards derive from the outrage and humiliation suffered by Plaintiff. This argument is somewhat speculative, and "[a]ny doubt in the mind of the appellate court concerning the question of what appropriate damages may be in the abstract, or owing to the coldness of the record, should be resolved in favor of the jury verdict." *Aken,* 2002–NMSC–021, ¶ 19, 132 N.M. 401, 49 P.3d 662.

{68} The third criterion, comparing the punitive damages award to civil and/or criminal penalties imposed for comparable misconduct, "has been criticized as ineffective and very difficult to employ." *Id.* ¶ 25, 132 N.M. 401, 49 P.3d 662. This is in part because there may be some categories of conduct for which there is *no* significant statutory guidance as to what sanctions should be imposed for the conduct. *Id.* As a result, our Supreme Court has characterized this criterion as "the least important indicium." *Id.* We can find no legislative guidance as to the civil or criminal sanctions that might be imposed for sexual harassment or retaliatory discharge. We doubt that Aakhus's misconduct could be characterized as any type of crime, but this does not render his behavior less reprehensible. On the civil side, the legislature, via the Human Rights Act, has clearly condemned discrimination, but it has not attempted to place a monetary valuation on recovery for violations of the Act. *See* § 28–

1–7 (listing the various forms of discrimination that are deemed unlawful); § 28–1–11(E) (permitting human rights commission to award "actual damages"); § 28–1–13(D) (permitting district court to award "actual damages"). This does not signify to us that discriminatory behavior is considered to be minimally sanctionable. To the contrary, it indicates the legislature's willingness to leave the assessment of reasonable compensation to the fact finder, whether the fact finder is the human rights commission or a court of law. Consequently, we deem the third criterion to be neutral. Because the other two criteria convince us of the reasonableness of the punitive damages award, we affirm the award.

## V. Plaintiff's Request for Attorney Fees

{69} Pursuant to Rule 12–403 NMRA (permitting appellate court to award attorney fees where allowed by law) and Section 28–1–13(D) (allowing award of attorney fees to prevailing party in an appeal under the Human Rights Act), Plaintiff asks us to award attorney fees for this appeal, or to remand to allow the district court to make this determination. We remand this issue to the district court to determine whether to make such an award and, if so, in what amount.

## CONCLUSION

{70} For the foregoing reasons, we affirm the judgment of the district court.

{71} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and JAMES J. WECHSLER, Judges.