# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: July 26, 2017

**NO. 35,086**

**DAVID J. FOGELSON and CORINNE FOGELSON, husband and wife,**

Plaintiffs-Appellees/Cross-Appellants,

v.

**ERIC WALLACE and MARK BOZZONE,**

Defendants-Appellants/Cross-Appellees,

and

**WALLEN DEVELOPMENT, INC.;**
**DEVELOPMENTS BY WALLEN, LLP;**
**BANK OF AMERICA, N.A.;**
**RAY'S FLOORING SPECIALIST, INC.;**
**and ESTANCIAS AT SANTIAGO**
**HOMEOWNERS' ASSOCIATION,**

Defendants.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**George P. Eichwald, District Judge**

Hunt & Davis, P.C.
Catherine F. Davis
Albuquerque, NM

for Appellees

New Mexico Litigation Group, LLC
Robert M. Koeblitz
Albuquerque, NM

for Appellant Wallace

Lorenz Law
Alice T. Lorenz
Albuquerque, NM

Lastrapes, Spangler & Pacheco, P.A.
Matthew M. Spangler
Bernalillo, NM

for Appellant Bozzone

# OPINION

**WECHSLER, Judge.**

{1}     This appeal results from a dispute between parties to a contract for the construction of a new home in Bernalillo, New Mexico. Appellants/Cross-Appellees Eric Wallace and Mark Bozzone (Appellants) appeal the district court's ruling that they are jointly and severally liable for intentional torts, including prima facie tort, intentional interference with contractual relations, and civil conspiracy.[1] Appellees/Cross-Appellants David and Corinne Fogelson (Appellees) appeal the district court's dismissal of various claims, including unfair trade practices against both Appellants and conversion against Bozzone.

{2}     Appellants first argue that the doctrines of res judicata or collateral estoppel barred Appellees' claims against them.[2] Bozzone did not raise res judicata at trial, but Wallace filed a motion to dismiss that ostensibly also applied to Bozzone and argued that res judicata barred Appellees' claims. As to Wallace, the requirements for res judicata are met, and Appellees' claims against him were barred. We therefore reverse

---

[1]Appellants each retained appellate counsel and submitted separate appellate briefs. Some appellate issues are raised by both Appellants, while others are raised only by Wallace or Bozzone.

[2]Because collateral estoppel cannot apply to a default judgment, we do not analyze this argument. *See Blea v. Sandoval*, 1988-NMCA-036, ¶ 14, 107 N.M. 554, 761 P.2d 432 ("[A] default judgment has no collateral estoppel effect.").

the district court's judgment against Wallace. As to Bozzone, Appellees first argue that Bozzone waived res judicata by failing to raise it at trial. Even if Wallace's motion to dismiss was procedurally sufficient to raise this issue for Bozzone, Appellees made fact-specific allegations against Bozzone. These allegations negated the applicability of Wallace's res judicata argument as to Appellees' claims against Bozzone. Appellees' claims against Bozzone were not, therefore, barred by res judicata.

{3} Bozzone additionally argues that the district court erred in (1) failing to dismiss Appellees' claim of prima facie tort and (2) ruling that he was liable for intentional interference with contractual relations because no duty existed between him and Appellees. With respect to Bozzone's first argument, we agree and reverse the district court's ruling on Appellees' claim of prima facie tort.

{4} We reinterpret Bozzone's second argument to question whether substantial evidence supports the district court's ruling that he was liable for intentional interference with contractual relations. We conclude that the district court's ruling in this regard was predicated upon its finding that Bozzone was a de facto officer or director of Wallen Development, Inc. and other affiliated corporate entities. We in turn also conclude that substantial evidence does not support the district court's

ruling on Appellees' claim of intentional interference with contractual relations and reverse on that claim as well.

{5}     Bozzone further argues that reversal of the district court's rulings on Appellees' claims of prima facie tort and intentional interference with contractual relations necessitates that we reverse the district court's ruling on Appellees' claim of civil conspiracy as a matter of law. We agree and reverse on that claim.

{6}     In their cross-appeal, Appellees first argue that the district court erred in dismissing their unfair trade practices claim. Although we take no position on the merits of the claim, we reverse the district court's dismissal as a matter of law and remand for additional proceedings on Appellees' unfair trade practices claim as to Bozzone only. Appellees additionally argue that the district court erred in dismissing their conversion claim against Bozzone. For the reasons discussed herein, we conclude that this claim lacks merit.

{7}     Although for different reasons, we reverse the district court's judgment against each Appellant. We remand for additional proceedings to determine whether Bozzone engaged in unfair trade practices.

**I.      BACKGROUND**

{8}     In 2007, Appellants, through various corporate entities to be discussed herein, along with Larry Filener, purchased Wallen Development, Inc. and other affiliated

3

corporate entities (collectively, Wallen) from Garry and Mary Wallen. They retained Jenice Montoya as the titular president and general manager of Wallen. Wallace was Wallen's president and vice president. Filener was Wallen's registered agent, secretary, and treasurer. Montoya oversaw the day-to-day operations of the company.

{9} On May 25, 2008, Wallen entered into a purchase agreement (the Purchase Agreement) with Appellees for the construction and purchase of a residential home (the Home) in Bernalillo, New Mexico. The Purchase Agreement contained an arbitration agreement (the Arbitration Agreement), mandating that disputes between the "Seller" and the "Purchasers" be settled by binding arbitration. Wallen was defined as "Seller," and Montoya signed the Purchase Agreement on behalf of Wallen. The Purchase Agreement also contained a cash addendum that called for four incremental cash payments. Construction of the Home began, and Appellees paid $165,111 of the total due under the Purchase Agreement.

{10} After experiencing significant financial difficulties, Wallen ceased operations in late February 2009. Appellees were notified of this closure by their Wallen sales associate. They attempted to contact Montoya and Bozzone about Wallen's plan, if any, to complete and deliver the Home. They then retained counsel, who, on March 18, 2009, sent Wallen a demand letter. Appellees copied Appellants and Filener on this letter.

4

**{11}** Appellees filed a complaint in arbitration against Wallen in district court seeking to enforce the Arbitration Agreement (the First Complaint). Wallen did not appear at the ordered arbitration proceeding, and the arbitrator entered an award in favor of Appellees. The arbitrator found that Wallen (1) breached the Purchase Agreement, (2) committed fraud, and (3) violated the Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2009), and awarded Appellees compensatory damages in the amount of $165,111. The arbitrator also awarded punitive damages in the amount of $165,111, as well as pre-judgment interest, costs, attorney fees plus gross receipts tax, and arbitrator fees. The district court entered a judgment confirming the arbitration award (the Arbitration Judgment). Wallen did not pay the Arbitration Judgment.

**{12}** Appellees then filed a complaint in the district court against Wallace, Filener, and other individuals and entities (the Second Complaint). Bozzone was not named in the Second Complaint. Appellees amended the Second Complaint (the Amended Complaint) to add Bozzone and Wallen and to remove Filener and other individuals and entities. The Amended Complaint alleged conversion, fraud, unfair trade practices, and civil conspiracy against Appellants. It also alleged intentional interference with contractual relations against Bozzone only.

{13}   Wallace filed a motion to dismiss the Amended Complaint, raising res judicata as an affirmative defense. The parties litigated the motion, and it was denied by the district court. Approximately two months after this denial, Bozzone answered the Amended Complaint. He did not raise res judicata in his answer. Bozzone then filed a motion to dismiss Appellees' unfair trade practices claim, which the district court granted.[3] The district court also granted Bozzone's motion to dismiss Appellees' fraud and conversion claims following the close of Appellees' case in chief at trial.

{14}   After trial, the district court ruled that (1) Wallace was liable for prima facie tort and civil conspiracy and (2) Bozzone was liable for prima facie tort, intentional interference with contractual relations, and civil conspiracy. As a basis for these rulings, it found that:

     1.   [Wallen was] purchased by [Appellants and] . . . Filener[.]

    . . . .

     16.   . . . Wallace was active at a high level in the management of the business.

     17.   . . . Bozzone was active at a high level of management, staffing, land purchases, [and] strategic planning for sales.

    . . . .

---

[3]The legal rationale underlying the district court's ruling makes clear that its dismissal of Appellees' unfair trade practices claim applied to Wallace as well.

6

19. [Appellants] and . . . Filener knew that subcontractors could lien properties.

. . . .

22. [Appellees] signed a Purchase Agreement with Wallen . . . to purchase a home to be constructed [in] . . . Bernalillo, New Mexico.

. . . .

24. [Appellees] were to pay cash for the house.

. . . .

30. [Appellants] and . . . Filener were aware that there was just a general operating account that all monies were put into.

. . . .

44. In September of 2008, construction financing was being cut off by Wachovia [Bank.]

. . . .

51. The decision to push payables and not pay vendors timely was made by [Appellants] collaboratively.

. . . .

55. Construction credit with Charter [Bank] and Compass [Bank] was expiring in December of 2008.

. . . .

60. [Appellants] and . . . Filener knew, or should have known, that [Appellees] had purchased property and were paying cash for it.

7

. . . .

69. Liens were being filed because of the instructions given by [Appellants] to delay payments to vendors.

70. . . . Bozzone became directly involved in the decisions about which liens to pay and that liens on closed homes should be paid first.

71. Even though [Appellees] had paid cash, other homes were being put ahead of [Appellees'] home for payment of liens based on . . . Bozzone's instructions to pay closed homes first.

72. [Appellants] were directly responsible for the failure to pay vendors on [Appellees'] home based on their decision to not pay vendors timely and which vendors to pay.

. . . .

78. . . . Bozzone instructed . . . Montoya that [Wallen] would close.

79. . . . Bozzone told . . . Montoya not to keep a skeleton staff to finish up the few homes within 30 days of completion.

. . . .

81. . . . Bozzone was only interested in information regarding the three homes for which he provided construction financing.[4]

---

[4]The district court additionally found that Appellees "have received nothing in return for their payment of $165,111." Although this finding was accurate at the time, Appellees subsequently purchased the Home in a foreclosure sale, using $40,000 of the unpaid Arbitration Judgment.

8

(Citations omitted.) The district court entered judgment against Appellants jointly and severally for compensatory damages in the amount of $165,111 and punitive damages in the amount of $165,111. It also awarded pre-judgment interest and costs. This appeal followed.

## II. RES JUDICATA

{15} Whether the Arbitration Judgment is res judicata to Appellees' claims in the present case is a question of law that we review de novo. *See Anaya v. City of Albuquerque*, 1996-NMCA-092, ¶ 5, 122 N.M. 326, 924 P.2d 735. Although the issue has been raised on prior occasions, our appellate courts have yet to decide whether res judicata applies to arbitration proceedings. *See, e.g.*, *Guest v. Berardinelli*, 2008-NMCA-144, ¶ 29, 145 N.M. 186, 195 P.3d 353 (declining to analyze the plaintiff's undeveloped argument that the claims brought against her could have been raised at a previous arbitration proceeding); *Bank of Santa Fe v. Marcy Plaza Assocs.*, 2002-NMCA-014, ¶ 15, 131 N.M. 537, 40 P.3d 442 ("Assuming, but not deciding, that res judicata would apply to an arbitration award[.]"). It appears that the majority general rule is that an arbitration proceeding can, depending on the particular circumstances, be subject to res judicata. *See* Restatement (Second) of Judgments § 84(1), at 286 (1982) ("[A] valid and final award by arbitration has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a

9

court."); *see, e.g.*, *Behrens v. Skelly*, 173 F.2d 715, 720 (3d Cir. 1949) (holding that the arbitrator's decision "on the merits of the claim . . . bars further litigation of the controversy by the parties and their privies").

{16} The doctrine of res judicata is "founded on principles of fairness and justice[,]" *Kirby v. Guardian Life Ins. Co. of Am.*, 2010-NMSC-014, ¶ 61, 148 N.M. 106, 231 P.3d 87, and "ensures finality, advances judicial economy, and avoids piecemeal litigation." *Bank of Santa Fe*, 2002-NMCA-014, ¶ 14. To achieve these purposes, res judicata "bars litigation of claims that were or could have been advanced in an earlier proceeding." *State ex rel. Martinez v. Kerr-McGee Corp.*, 1995-NMCA-041, ¶ 11, 120 N.M. 118, 898 P.2d 1256. We believe that the principles of res judicata apply regardless of whether the parties have previously resolved their claims through a judgment in a litigated or arbitrated proceeding, but we emphasize that each arbitration case is to be scrutinized against these principles on a case-by-case basis and that res judicata is to be applied, or not, based on the particular circumstances of the arbitration proceeding and any court confirmation of an arbitration award. *See Deflon v. Sawyers*, 2006-NMSC-025, ¶ 4, 139 N.M. 637, 137 P.3d 577 ("Determining whether parties are in privity for purposes of res judicata requires a case-by-case analysis.").

{17} "A party asserting res judicata . . . must establish that (1) there was a final judgment in an earlier action, (2) the earlier judgment was on the merits, (3) the parties in the two suits are the same, and (4) the cause of action is the same in both suits." *Potter v. Pierce*, 2015-NMSC-002, ¶ 10, 342 P.3d 54. The finality requirements are satisfied and are therefore not at issue in the present case. *See* NMSA 1978, § 44-7A-27 (2001) (conferring jurisdiction to enter judgment on an arbitration award); *First State Bank v. Muzio*, 1983-NMSC-057, ¶ 9, 100 N.M. 98, 666 P.2d 777 (holding that a prior default judgment is res judicata "on issues which were, or could have been, determined in the earlier action"), *overruled on other grounds by Huntington Nat'l Bank v. Sproul*, 1993-NMSC-051, ¶ 32, 116 N.M. 254, 861 P.2d 935.

{18} Appellants argue on appeal that the district court's entry of the Arbitration Judgment precluded Appellees from relitigating the same issues against them in the subsequently filed case. As a threshold matter, we elaborate on our previously discussed determination on the issue of waiver.

**A. Waiver**

{19} "[R]es judicata is an affirmative defense which must be raised or it is permanently waived." *Xorbox v. Naturita Supply Co.*, 1984-NMSC-062, ¶ 12, 101 N.M. 337, 681 P.2d 1114; *see* Rule 1-008(C) NMRA ("In pleading to a preceding

pleading, a party shall set forth affirmatively . . . res judicata[.]"). The defense may be raised in either a responsive pleading or a motion to dismiss. *See Universal Life Church v. Coxon*, 1986-NMSC-086, ¶ 9, 105 N.M. 57, 728 P.2d 467; *Xorbox*, 1984-NMSC-062, ¶ 12. The purpose of the raise-or-waive requirement for res judicata is to "provid[e] the plaintiff with notice and the opportunity to demonstrate why the affirmative defense should not succeed." *Robinson v. Johnson*, 313 F.3d 128, 134-35 (3d Cir. 2002).

{20}     On April 13, 2012, approximately six months before Bozzone entered his appearance in this case, Wallace filed a motion to dismiss the Amended Complaint, asserting that it "is barred by the [d]octrine . . . of [r]es [j]udicata." On May 24, 2012, the district court heard argument on this issue, among others, and denied the motion. It is clear, therefore, that Wallace raised, and by extension preserved, his res judicata argument. *Crutchfield v. N.M. Dep't of Taxation & Revenue*, 2005-NMCA-022, ¶ 14, 137 N.M. 26, 106 P.3d 1273 ("To preserve error for review, a party must fairly invoke a ruling of the district court on the same grounds argued [on appeal].").

{21}     During the May 24, 2012 hearing, Wallace repeatedly invoked Bozzone, and the preclusive effect of the Arbitration Judgment as to "Defendants within privity" with Wallen, despite the fact that Bozzone had not yet entered an appearance in the case. Appellants argued, to the contrary, that Bozzone was not represented at the

12

hearing. The district court denied the motion as a matter of law, implying that res judicata did not apply to nonsignatories of arbitration agreements.

{22} On October 10, 2012, Bozzone filed his answer to Appellees' Amended Complaint. He did not assert, in his answer or otherwise, that res judicata barred Appellees' claims. In his brief in chief, Bozzone argues that he preserved his res judicata defense in his opening statement at trial. An opening statement is not a permissible mechanism by which to raise an affirmative defense. *Cf. Proper v. Mowry*, 1977-NMCA-080, ¶ 31, 90 N.M. 710, 568 P.2d 236 ("The primary purpose of [an opening statement] is to inform the jury of the nature of the case[.]"). However, under the unique circumstances of this case, we conclude that another doctrine, law of the case, would negate Appellees' argument that Bozzone waived res judicata *if, but only if*, the allegations against Appellants were substantially the same such that a legal ruling as to Wallace would directly apply to Bozzone. *See United States v. LaHue*, 261 F.3d 993, 1010 (10th Cir. 2001) ("[W]hen a rule of law has been decided adversely to one or more codefendants, the law of the case doctrine precludes all other codefendants from relitigating the legal issue." (internal quotation marks and citation omitted)); *Alba v. Hayden*, 2010-NMCA-037, ¶ 7, 148 N.M. 465, 237 P.3d 767 ("Under the law of the case doctrine, a decision on an issue of law made at one

stage of a case becomes a binding precedent in successive stages of the same litigation." (internal quotation marks and citation omitted)).

{23} We therefore review whether Wallace's res judicata argument applied equally to Bozzone such that the law of the case doctrine applies. The Amended Complaint alleged (1) when Wallen ceased operations, it had the Home and several other unfinished homes under contract; (2) of the homes that were unfinished when Wallen ceased operations, only those for which Bozzone provided construction funding were completed; and (3) the Bozzone-funded homes were eventually sold and the construction financing was paid off. These allegations formed the basis of Appellees' intentional interference with contractual relations claim against Bozzone, which alleged that Bozzone improperly induced Wallen to breach the Purchase Agreement by deciding to complete only homes for which he provided construction financing.

{24} Although the First Complaint alleged fraud, it did not allege the specific conduct raised in Appellees' intentional interference with contractual relations claim, including the decision not to complete construction on the Home but, instead, to complete construction on other homes in which Bozzone had a personal financial interest. Appellees did not allege this conduct against Wallace. It would, therefore, stretch credulity to conclude that Wallace's motion to dismiss raised these issues such that res judicata would bar Appellees' claims against Bozzone.

14

{25}    Because the law of the case doctrine does not apply, we review whether res judicata barred Appellees' claims as to Wallace only. Wallace argues that the identity of parties and identity of cause of action requirements were met such that res judicata precluded Appellees' claims against him. Appellees claim that (1) Wallace was not in privity with Wallen in the arbitration proceeding because he was not a signatory to the Arbitration Agreement and (2) the intentional torts alleged in the present case are not the same claims adjudicated in the arbitration proceeding.

**B.    Privity**

{26}    Res judicata's privity requirement applies to both the parties in the previous action and those with whom the parties are in privity. *See Deflon*, 2006-NMSC-025, ¶ 2 ("Res judicata prevents a party or its privies from repeatedly suing another for the same cause of action."). "Privity requires, at a minimum, a substantial identity between the issues in controversy and showing that the parties in the two actions are really and substantially in interest the same." *Boyd Estate ex rel. Boyd v. United States*, 2015-NMCA-018, ¶ 25, 344 P.3d 1013 (internal quotation marks and citation omitted). Although a "parent-subsidiary relationship does not of itself establish privity[,]" 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4460, at 634 (2d ed. 2002), the Restatement (Second) of

15

Judgments recognizes that claim preclusion is appropriate if members of an ownership group directly control a corporate entity:

> When the corporation is closely held, . . . interests of the corporation's management and stockholders and the corporation itself generally fully coincide. By definition, the stockholders are few in number and either themselves constitute the management or have direct personal control over it. In many respects, the enterprise is a proprietorship or partnership conducted in corporate form. . . . For the purpose of affording opportunity for a day in court on issues contested in litigation, . . . there is no good reason why a closely held corporation and its owners should be ordinarily regarded as legally distinct.

Restatement (Second) of Judgments § 59 cmt. e, at 99; *see, e.g.*, *Sparks Nugget, Inc. v. Comm'r*, 458 F.2d 631, 639 (9th Cir. 1972) (" 'It would seem that the public policy underlying the doctrine of res judicata, as a bar to repetitious litigation, would support a finding of privity between a close corporation and its sole or controlling stockholder.' " (quoting 1B James Wm. Moore, *Moore's Federal Practice* ¶ 0.422[3] (2d ed. 1996))). We therefore conclude that privity may exist when the interests of a corporate entity and members of its ownership group "fully coincide." Restatement (Second) of Judgments § 59 cmt. e, at 99.

{27} The district court found that Wallen was "purchased" by Appellants and Filener. This finding of fact is supported by documentary evidence but fails to describe the series of corporate entities involved. Wallace's Exhibit R shows that, in a two-step process, Wallen was sold to Wall2 Builders. Wall2 Builders was a limited

16

partnership, in which the general partner was Wall2 Holdings, LLC. The members of Wall2 Holdings, LLC were Wallace, Filener, and Mooresville Development, LLC (Mooresville). Bozzone was the managing member of Mooresville. The limited partners in Wall2 Builders were Filener, Mooresville, and a limited partnership named "8Fish." Wallace was the president of 8Fish. Wallace, through 8Fish, owned approximately sixty-five percent of Wall2 Builders. Filener, individually, and Bozzone, through Mooresville, owned approximately ten percent and twenty-five percent of Wall2 Builders, respectively. As such, Wallace, through corporate entities he controlled, owned a controlling interest in Wall2 Builders and, by extension, Wallen. Wallace also served as both president and vice president of Wallen.

{28} In addition to establishing Wallen's ownership and management structure, the evidence also indicated that Wallace—in concert with Bozzone and Filener—directly controlled Wallen's financial and strategic decision-making. One particularly compelling example of this control is an email message Wallace sent to Bozzone on April 29, 2008—approximately one month before Appellees signed the Purchase Agreement and approximately ten months before Wallen closed. The email message stated, in part:

> Here is the plan of attack, in summary: (1) get all the necessary data to [the banking expert], . . . (3) get [the banking expert] to review the situation and give us an opinion[,] . . . (4) take [the banking expert's] banking recommendations and act on them preliminarily which I expect

17

to include (a) a negotiation with [the former owner] that he has to convert his loans to equity or some other workable arrangement[,] (b) a negotiation with the banks based on [the banking expert's] recommendations or make a decision on the appropriate . . . approaches that are recommended, (c) make internal changes as needed which may include (i) [Montoya's] emphasis as general manager with insistence that she make [general manager] decisions, not actions based on what [Filener], [Wallace], or [Bozzone] just dictate, (ii) internal cuts, (iii) focus on sales and marketing, (iv) reduce incentives, (v) focus only on the Alb[uquerque] and current markets until directed otherwise by us, (vi) other actions based upon the analysis. We will probably sublease the office space and turn the building back over to [the former owner], if possible, and go find cheaper space. We are not moving based on what is best for [Filener], and this was discussed with and agreed to by [Filener]. He is investigating space separate from Wallen's needs. Please have confidence that [Filener] will do whatever is best for the company and what we (you and I) ask him to do or not to do. Again, I need [Montoya] to act as the [general manager] and not a puppet of us.

This email message is consistent with Montoya's testimony, which strongly implied that her duties as general manager were limited to overseeing Wallen's day-to-day operations and that her input on strategic or financial decisions was limited.

{29}    Although Wallen's financial circumstances were such that no money was flowing from Wallen to Wall2 Builders during the time period at issue, Wallace's control over Wallen appears satisfied under the circumstances. *See Garcia v. Coffman*, 1997-NMCA-092, ¶ 18, 124 N.M. 12, 946 P.2d 216 ("Control is not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or

18

existence of its own." (alterations, internal quotation marks, and citation omitted)). In addition to serving as both president and vice president of Wallen, Wallace—through other corporate entities—was the controlling stockholder of Wall2 Builders and Wallen. He engaged in negotiations with Wallen's lenders. He determined (1) the timing of payments to creditors and vendors and (2) that Wallen would close—the "transaction[s] attacked" in the present case. *Id.* (internal quotation marks and citation omitted). Perhaps most significantly, he characterized Wallen's general manager as a "puppet."

{30} Although Montoya and other Wallen employees controlled the day-to-day operations of Wallen, Wallace exercised the type of control contemplated in Section 59, comment e of the Restatement (Second) of Judgments, which discusses the possibility that "the enterprise is a proprietorship or partnership conducted in corporate form." Under these circumstances, Wallace's interests "fully coincide[d]" with Wallen's such that he was in privity with Wallen for purposes of res judicata. *See id.*

{31} Appellees' argument against a determination that privity existed between Wallace and Wallen relies in part on *Heye v. American Golf Corp.*, 2003-NMCA-138, ¶ 8, 134 N.M. 558, 80 P.3d 495, for the proposition that "a legally enforceable contract is a prerequisite to arbitration[,]" and in part on *Deflon* for the proposition

19

that privity does not exist when claims are brought against corporate employees in their individual capacities. *See Deflon*, 2006-NMSC-025, ¶ 5 (citing *Morgan v. City of Rawlins*, 792 F.2d 975, 980 (10th Cir. 1986), and holding that "privity does not exist where an initial lawsuit is brought against an employer and a second lawsuit is then brought against an employee acting in his or her individual capacity").

{32} First, aside from their citation to *Heye*, Appellees develop no additional legal argument for the proposition that a nonsignatory to an arbitration agreement cannot be in privity with a signatory under the facts of this case. *See State v. Sanchez*, 2015-NMCA-077, ¶ 14, 355 P.3d 51 (explaining that when a party "has cited no authority on [a] factual nuance, we may assume none exists"). The Arbitration Agreement provided that "[i]n the event that a dispute arises between Seller and Purchasers in any way relating to or arising from the construction, including . . . the terms and provisions of th[e Purchase] Agreement, Purchasers and Seller agree to resolve the dispute exclusively th[r]ough binding arbitration." The Purchase Agreement provided for the "construction and sale of the [l]ot and completed [h]ome." When Wallen failed to deliver a completed home, a dispute related to the construction arose. In the Amended Complaint, Appellees alleged that Wallace's (1) use of funds paid by Appellees pursuant to the Purchase Agreement for alternate purposes and (2) misrepresentations related to his intent to deliver a completed home constituted

conversion, fraud, unfair trade practices, civil conspiracy, and prima facie tort. Like the underlying breach of contract claim, these claims arose from "a dispute . . . relating to . . . the terms and provisions" of the Purchase Agreement. Even accepting that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit[,]" *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960), in our view, the particular circumstances in this case show that Wallace, the controlling stockholder, president, and vice president of Wallen, should have been named as a party in the arbitration proceeding to defend against alleged claims of tortious conduct on his part, including but not limited to fraud. *See* NMSA 1978, § 44-7A-7(b) (2001) ("The court shall decide whether an agreement to arbitrate exists or a controversy is subject to an agreement to arbitrate."); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776-78 (2d Cir. 1995) (holding that five theories, based in common law and agency principles, justify binding nonsignatories to arbitration agreements: "1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel"); *Potter*, 2015-NMSC-002, ¶ 1 ("Res judicata is a judicially created doctrine designed to promote efficiency and finality by giving a litigant only one full and fair opportunity to litigate a claim and by precluding any later claim that could have, and should have, been brought as part of the earlier proceeding.").

{33}    Next, in *Deflon*, which was first litigated as *Deflon v. Danka Corp.*, 1 F. App'x 807 (10th Cir. 2001), the plaintiff filed claims against her former employer in the United States District Court for the District of New Mexico for alleged violations of Title VII, the Equal Pay Act, and state law tort claims. *Deflon*, 2006-NMSC-025, ¶ 1. All of the plaintiff's claims were based on the conduct of Danka employees. *Id.* After the United States District Court granted summary judgment on all claims, the plaintiff filed claims against Danka employees in state district court for (1) intentional infliction of emotional distress, (2) intentional interference with contractual relations, (3) defamation, (4) prima facie tort, and (5) civil conspiracy. *Id.* The district court ruled that res judicata and collateral estoppel barred the plaintiff's claims. *Id.* The plaintiff appealed the district court's ruling as to intentional interference with contractual relations and civil conspiracy to this Court, which affirmed. *Id.* Our Supreme Court reversed, holding that because "[p]arties to a contract cannot bring an action for tortious interference [with contract]," the plaintiff could not have brought this claim against Danka in federal court. *Id.* ¶ 6 (internal quotation marks and citation omitted). It thereafter held that privity did not exist given the nature of the plaintiff's intentional interference and related conspiracy allegations against the defendants. *See id.* ¶ 10 ("Because we interpret [the p]laintiff's complaint as alleging that [the d]efendants acted outside the scope of their corporate authority, we do not

22

find [the d]efendants and Danka in privity for purposes of the intentional interference with contract a claim.").

{34}     Appellees did not allege intentional interference with contractual relations against Wallace. Instead, they alleged conversion, fraud, unfair trade practices, civil conspiracy, and prima facie tort. Unlike intentional interference with contractual relations, these claims may be brought by one party to a contract against the other. *See, e.g.*, § 57-12-2(D)(17) (defining "unfair trade practices" to include "failing to deliver the quality or quantity of goods or services contracted for"); *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008) (explaining that one party to a contract may bring a claim for civil theft or conversion against another if the conduct alleged "go[es] beyond . . . a failure to comply with the terms of a contract"); *Beaudry v. Farmers Ins. Exch.*, 2017-NMCA-016, ¶¶ 1-3, 388 P.3d 662 (affirming a judgment on the plaintiff's prima facie tort claim arising from an employment contract), *cert. granted* (No. 36,181, Dec. 19, 2016); *Kaveny v. MDA Enters., Inc.*, 2005-NMCA-118, ¶¶ 17-18, 138 N.M. 432, 120 P.3d 854 (holding that misrepresentations in inducing a contract constituted fraud). Therefore, inasmuch as Appellees' claims fell within the scope of the Arbitration Agreement, we see no reason why Appellees could not have brought these claims against Wallace in the arbitration proceeding.

23

{35}    Our conclusion on the issue of privity is closely tied to the facts of this case and is bolstered by evidence indicating that Appellees were aware of Wallen's management structure prior to filing the First Complaint against Wallen alone. On March 18, 2009, Appellees sent a demand letter to Wallen, which they copied to Wallace. The act of copying Wallace on their demand letter demonstrated Appellees' awareness of Wallace as a potential party to their claims.

{36}    Certainly, there are circumstances in which the absence of discovery could justify a plaintiff's failure to name potential parties in arbitration, including unknown partners, investors, or stockholders who may be liable for the conduct that gave rise to the claim or claims. Under such circumstances, res judicata should not apply as a bar to subsequent intentional tort claims. Wallace, however, was the controlling stockholder, president, and vice president of Wallen. His involvement in the management of Wallen was known to Appellees at the time they filed the First Complaint.

{37}    Additionally, the circumstances of this case are not such that Appellees have been unable to secure a judgment for the full amount of their compensatory damages. *See Gandy v. Wal-Mart Stores, Inc.*, 1994-NMSC-040, ¶ 12, 117 N.M. 441, 872 P.2d 859 (stating that a "proper application of the doctrine of res judicata[] will prevent double recovery and duplicative proceedings"); *cf. Ritchie v. Landau*, 475 F.2d 151,

156 (2d Cir. 1973) (holding that a plaintiff bringing a subsequent action for fraud "must be able to show actual damages resulting from the fraud which are distinguishable from the damages which he has already recovered in a prior adjudicatory proceeding"). The arbitrator awarded Appellees the full amount of compensatory damages alleged. We do not consider the fact that the Arbitration Judgment proved partially uncollectible to be relevant to a res judicata analysis.

**C.     Same Cause of Action**

{38}     The identity of the cause of action requirement is determined using "the transactional approach," that "considers all issues arising out of a common nucleus of operative facts as a single cause of action." *Potter*, 2015-NMSC-002, ¶ 11 (internal quotation marks and citation omitted). "The facts comprising the common nucleus [are] identified pragmatically, considering (1) how they are related in time, space, or origin, (2) whether, taken together, they form a convenient trial unit, and (3) whether their treatment as a single unit conforms to the parties' expectations or business understanding or usage." *Id.* (internal quotation marks and citation omitted).

**1.     Relatedness of Facts**

{39}     The First Complaint alleged breach of contract, unfair trade practices, and fraud. After Wallen failed to appear for the arbitration proceeding, the arbitrator found that Wallen (1) breached the Purchase Agreement, (2) engaged in unfair trade

25

practices by "failing to provide the services contracted for and failing to provide the quality of goods purchased[,]" and (3) committed fraud by "intentionally receiving payments from [Appellees], refusing to complete construction and sale of the [Home] described in the [P]urchase [A]greement, refusing to return the monies paid by [Appellees], demanding payment of additional funds from [Appellees] two weeks before going out of business, and converting the monies tendered by [Appellees] for their benefit instead of returning the funds to [Appellees]."

{40} Both the First Complaint and the Amended Complaint alleged fraud and unfair trade practices. As to Wallace, the Amended Complaint additionally alleged prima facie tort, conversion, and civil conspiracy. Although these claims expand upon those alleged in the First Complaint, in determining whether res judicata bars the subsequent suit, we examine whether "the same operative facts form the basis of both . . . complaint[s]" and whether "[t]he same alleged wrongs are sought to be redressed in both lawsuits." *Ford v. N.M. Dep't of Pub. Safety*, 1994-NMCA-154, ¶ 31, 119 N.M. 405, 891 P.2d 546; *see also Gandy*, 1994-NMSC-040, ¶ 11 (stating that a plaintiff cannot recover under both contract and tort theories for the same harm).

{41} The operative facts in the present case are similar with respect to time, space, and origin to those in the arbitration proceeding in that Appellees' claims in both

26

arose from conduct related to the purchase and construction of the Home, including business decisions made during the same time period. As to Wallace, the Amended Complaint alleged (1) conversion resulting from the use of Appellees' money "for expenses unrelated to the construction of the [Home]"; (2) fraud resulting from the inducement of Appellees "to continue making payments . . . notwithstanding . . . that the subcontractors and suppliers were not being paid and Wallen . . . was preparing to go out of business"; (3) unfair trade practices resulting from misrepresentations that they "intended to provide construction services for the construction of [the H]ome" and "were paying [Appellants'] subcontractors [with] monies received from [Appellees] and intended to convey the [Home] to [Appellees] free and clear of any and all liens"; (4) civil conspiracy resulting from Appellants "taking [Appellees'] money, but failing to construct the [H]ome . . . and transfer it to [Appellees] free of liens"; and (5) prima facie tort resulting from Appellants "using [Appellees'] money to pay expenses for things other than the construction of the . . . Home, . . . continuing to accept [Appellees'] money after it became apparent that Wallen . . . was in serious financial difficulty and would be unable to continue . . . , and . . . completing only homes on which . . . Boz[z]one held the construction financing."

{42}    These claims arose from the same conduct alleged against Wallen in the First Complaint. Beginning in March 2008, Appellees made payments pursuant to the

27

terms of the Purchase Agreement. They made the last of these payments on February 9, 2009, just weeks before Wallen closed. The monies paid by Appellees went into a general fund rather than being dedicated to the specific purpose of constructing the Home. Vendors and suppliers other than those working on the Home were paid with the monies paid by Appellees. Appellees did not close on the Home prior to the date Wallen ceased operations. These are the "same operative facts" and "same alleged wrongs" that formed the basis of the First Complaint. *Ford*, 1994-NMCA-154, ¶ 31.

**2.     Trial Convenience**

{43}     "In considering whether the facts form a convenient unit for trial, we examine overlap of the witnesses and evidence relevant to the claims in the two lawsuits." *Anaya*, 1996-NMCA-092, ¶ 14. This analysis is complicated by the fact that only Appellees appeared and provided testimony in the arbitration proceeding. However, we have no reason to believe that the witnesses or evidence relevant to Appellees' claims in the arbitration proceeding and in the trial on the Amended Complaint would not substantially overlap.

{44}     As discussed above, the First Complaint made allegations that are essentially the same as those in the Amended Complaint. At trial, the primary witnesses included David Fogelson, Montoya, Wallace, Bozzone, and Filener. Their testimony described the conduct of the parties and the extent to which Appellants controlled Wallen

28

during the relevant time period. The documentary evidence included (1) email messages and other internal documents memorializing Wallen's business practices during the relevant time period and (2) additional documents establishing the connection between Wallace, Wallen, and other corporate entities. These primary witnesses and documents are the same as would have been required to prove the claims alleged in the First Complaint had Wallen appeared.

{45} In *Anaya*, this Court held that "allegations of conduct by *different persons in dissimilar situations and at distinct times* . . . suggest that the claims advanced in the two cases do not form a convenient trial unit." *Id.* ¶ 15 (emphasis added). Because none of these considerations is present in the present case, Appellees' claims against Wallace formed a convenient trial unit regardless of Appellees' decision not to bring the claims together in the arbitration proceeding.

**3.    Parties' Expectations**

{46} Similarly, in considering whether the application of res judicata would be consistent with the parties' expectations, we review whether Wallace "had reason to expect that the additional claims raised . . . were precluded by the judgment . . . in the prior lawsuit." *Id.* ¶ 17. Generally speaking, our analysis focuses upon the expectation of the party asserting res judicata. *See Bank of Santa Fe*, 2002-NMCA-014, ¶ 21 (evaluating the reasonableness of the lessor's expectation of finality); *Anaya*, 1996-

NMCA-092, ¶ 17 (evaluating the reasonableness of the defendants' expectation of finality). *But see Myers v. Olson*, 1984-NMSC-015, ¶ 14, 100 N.M. 745, 676 P.2d 822 (evaluating the reasonableness of each former spouse's expectation of finality with respect to a stipulated divorce decree). Such expectations can be based upon the procedural posture of each proceeding relative to the other. *See Anaya*, 1996-NMCA-092, ¶ 17 (noting that "[a]s of the time of the trial and judgment in [the first case], the action underlying th[e] appeal was pending in district court").

{47}    In *Anaya*, the two cases proceeded simultaneously, with one reaching trial and judgment first, while the other was still in discovery. *Id.* Under those circumstances, we held that the parties had no reason to expect that the issues developed in the second case were res judicata under the first judgment. *Id.*

{48}    In the present case, the initial case proceeded independently to completion, and the district court confirmed the Arbitration Judgment. Only after Wallen failed to pay the Arbitration Judgment, did Appellees file the Amended Complaint against Appellants in their individual capacities. As discussed above, Wallace's interests fully coincided with Wallen's such that privity existed, and in our view, he should have been named as a party in the arbitration proceeding to defend against alleged claims of tortious conduct. It was, therefore, not unreasonable for Wallace to expect

30

that additional claims arising from "a common nucleus of operative facts" would be barred by res judicata. *Potter*, 2015-NMSC-002, ¶ 14.

**D.      Torts Committed by Appellants in Their Individual Capacities**

{49}      Appellees argue that the claims were not the same as those adjudicated in the arbitration proceeding because the Amended Complaint alleged intentional torts against Wallace in his individual capacity. We are not persuaded.

{50}      It is well established that officers and agents of corporations can be held individually liable for their tortious acts. *See Kaveny*, 2005-NMCA-118, ¶ 20 ("Officers of corporations can be held personally liable when they commit intentional torts."); *Kreischer v. Armijo*, 1994-NMCA-118, ¶ 5, 118 N.M. 671, 884 P.2d 827 ("[A]n agent may be held individually liable for his own tortious acts, whether or not he was acting for a disclosed principal."). Appellees cite both of these cases for the proposition that, because the district court "found intentional torts were committed by [Appellants], it is clear that the subject matter of the arbitration [proceeding] and the instant case is not identical."

{51}      "[T]he difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Kreischer*, 1994-NMCA-118, ¶ 6 (internal quotation marks and citation omitted). In the First Complaint, Appellees alleged

31

breach of contract, unfair trade practices, and fraud. In the Amended Complaint, Appellees alleged unfair trade practices and various intentional torts. The Arbitration Judgment and the findings of fact and conclusions of law in the present case both outline the bases for the judgments against Wallen and Wallace in his individual capacity.

{52} These factual bases, however, have no bearing on our res judicata analysis. Res judicata bars subsequent litigation that "could have, and should have, been brought as part of the earlier proceeding." *Potter*, 2015-NMSC-002, ¶ 1. *Kaveny* and *Kreischer* speak only to the defendants' individual liability and not to claim preclusion. *See generally Kaveny*, 2005-NMCA-118, ¶ 20 (analyzing issues raised without reference to res judicata); *Kreischer*, 1994-NMCA-118, ¶ 5 (same).

{53} Appellees' answer brief, after listing various factual findings made by the district court, states that "[n]one of [the] allegations for prima facie tort [or] conspiracy . . . were part of the [First Complaint] against Wallen." We disagree and conclude that, as to Wallace, the Amended Complaint is merely a restatement of Appellees' breach of contract, unfair trade practices, and fraud claims from the First Complaint.

**E.  Conclusion as to Wallace**

{54}  The identity of party and cause of action requirements for res judicata are met with respect to Wallace. We therefore reverse the judgment against him.

**III.  BOZZONE'S LIABILITY FOR INTENTIONAL TORTS**

{55}  We next review the district court's ruling that Bozzone, in his individual capacity, was liable for prima facie tort, intentional interference with contractual relations, and civil conspiracy. Our task is complicated by the fact that the district court's findings of fact fail to expressly define the relationship that existed between Bozzone and Wallen. However, each of the cases cited in the district court's conclusions of law discusses the imposition of individual tort liability to an officer and/or director of a corporation.[5] Given its citation to these cases, we conclude that

---

[5]*See Deflon*, 2006-NMSC-025, ¶ 9 (holding that "[a]n officer acting outside the scope of his or her employment and in his or her own private interest has no authority to breach the corporation's contract, and that officer should not be able to hide behind a corporate shield for unauthorized conduct"); *Kaveny*, 2005-NMCA-118, ¶ 20 (holding that "[o]fficers of corporations can be held personally liable when they commit intentional torts"); *Ettenson v. Burke*, 2001-NMCA-003, ¶ 17, 130 N.M. 67, 17 P.3d 440 (holding that "a corporate officer is privileged to interfere with his corporation's contracts only when he acts in good faith and in the best interests of the corporation, as opposed to his own private interests"); *Stinson v. Berry*, 1997-NMCA-076, ¶ 17, 123 N.M. 482, 943 P.2d 129 (holding that "if an officer or director directs or actively participates in the commission of the tortious act of the corporation, he [or she] will be liable, along with the corporation").

33

the district court predicated its conclusions of law upon a finding that Bozzone was a de facto officer or director of Wallen.

{56} Viewing the district court's conclusions of law in this light, Bozzone's agency-based arguments on appeal are more properly characterized as a question of the sufficiency of the evidence: whether substantial evidence supports a finding of liability with respect to each element of (1) prima facie tort, (2) intentional interference with contractual relations, and (3) civil conspiracy. We address the arguments raised by Bozzone on appeal through this lens. To the extent that Appellees argue that Bozzone did not preserve such an argument at trial, Bozzone's motion to dismiss at the close of Appellees' case in chief operated as a challenge to the sufficiency of the evidence. *See Mayer v. Smith*, 2015-NMCA-060, ¶¶ 7-9, 350 P.3d 1191 (describing a motion to dismiss in a non-jury trial as a challenge to the sufficiency of the evidence).

**A. Prima Facie Tort**

{57} As a threshold matter, we consider whether the district court erred in denying Bozzone's motion to dismiss Appellees' claim of prima facie tort at the close of Appellees' case in chief. "We review the denial of a motion to dismiss de novo because such a motion tests the legal sufficiency of the allegations." *Padilla v. Wall Colmonoy Corp.*, 2006-NMCA-137, ¶ 7, 140 N.M. 630, 145 P.3d 110.

34

{58} Although Bozzone's motion to dismiss focused generally on Appellees' failure to prove the elements of prima facie tort, at trial, counsel described prima facie tort as a "catchall" claim. In *Bogle v. Summit Investment Co.*, this Court discussed the applicability of prima facie tort under similar circumstances and held that when "intentional interference with contract[ual relations] . . . was the appropriate tort action[,] . . . there was simply no need to resort to prima facie tort." 2005-NMCA-024, ¶¶ 22-24, 137 N.M. 80, 107 P.3d 520. This holding established that prima facie tort (1) "should be used to address wrongs that otherwise escaped categorization, but should not be used to evade stringent requirements of other established doctrines of law" and (2) was inapplicable regardless of the fact that the plaintiff was unable to prove its claim of intentional interference with contractual relations. *Id.* ¶¶ 22, 24 (internal quotation marks and citation omitted).

{59} Appellees acknowledge in their answer brief that recovery under both theories is not permitted. Appellees disregard *Bogle*, however, in arguing that the district court's ruling on Bozzone's motion to dismiss their prima facie tort claim was related to the outcome of their intentional interference with contractual relations claim. The existence, not the outcome, of a colorable, alternate claim in tort determines the applicability of prima facie tort. *See id.* ¶ 24 (holding that when "existing causes of

35

action provide[] reasonable avenues to a remedy[,] . . . [p]rima facie tort has no application").

{60} Following Appellees' case in chief, the district court ruled that the evidence at trial supported a claim for intentional interference with contractual relations. The district court therefore erred in denying Bozzone's motion to dismiss Appellees' prima facie tort claim. We reverse the judgment against him as to that claim.

**B.      Intentional Interference With Contractual Relations**

{61} "Substantial evidence is relevant legal evidence which a reasonable person would accept as adequate to support a conclusion[.]" *Durrett v. Petritsis*, 1970-NMSC-119, ¶ 10, 82 N.M. 1, 474 P.2d 487. In reviewing whether substantial evidence supports a verdict, we "indulge all reasonable inferences in support of the verdict[], disregarding all inferences or evidence to the contrary." *Id.* ¶ 9. Substantial evidence must support each element of a claim. *See Lucero v. Lucero*, 1994-NMCA-128, ¶ 21, 118 N.M. 636, 884 P.2d 527 ("[E]vidence must be adduced to support each element necessary to support a claim."), *superseded by statute on other grounds as stated in Chapman v. Varela*, 2009-NMSC-041, ¶ 21, 146 N.M. 680, 213 P.3d 1109.

{62} To establish a claim of intentional interference with contractual relations, a party must prove five elements: (1) the defendant had "knowledge of the contract between [the plaintiff] and the corporation[;] (2) performance of the contract was

refused[;] (3) [the defendant] played an active and substantial part in causing [the plaintiff] to lose the benefits of his [or her] contract[;] (4) damages flowed from the breached contract[;] and (5) [the defendant] induced the breach without justification or privilege to do so." *Ettenson*, 2001-NMCA-003, ¶ 14 (internal quotation marks and citation omitted). We assume that the first four factors are met in the present case and focus our analysis on the fifth factor: whether justification or privilege excused Bozzone's inducement of the breach of the Purchase Agreement.

{63}     Corporate officers may be held liable for their own intentional torts. *See Deflon*, 2006-NMSC-025, ¶ 9 ("An officer acting outside the scope of his or her employment and in his or her own private interest . . . should not be able to hide behind a corporate shield for unauthorized conduct."). However, this Court has recognized that "a corporate officer is privileged to interfere with his [or her] corporation's contracts . . . when he [or she] acts in good faith and in the best interests of the corporation[.]" *Ettenson*, 2001-NMCA-003, ¶ 17. This determination requires that district courts undertake a fact-specific inquiry that examines "the motivating forces" behind the inducement of the breach—specifically whether the breach "serve[d the defendant's] private interest with no benefit to the corporation." *Id.* ¶ 18 (internal quotation marks and citation omitted).

{64} Only an officer or director of Wallen could have directed Montoya's actions or made decisions about delaying payments to vendors and closing the company as described in the district court's findings of fact. The central question before this Court is, therefore, whether Bozzone (1) made these decisions while acting outside the scope of his duties as a de facto officer and (2) was motivated by private rather than corporate interests. The district court decided this question in the affirmative. We disagree that the evidence—even when viewed in a light most favorable to the verdict—supports such a conclusion.

{65} During 2008 and early 2009, Wallen lacked cash resources. The cash it did have, including that from Appellees' payments pursuant to the Purchase Agreement, was pooled and allocated in a manner determined by the management group, including Bozzone. One of these determinations was to use Appellees' money to pay vendors and other outstanding debts instead of prioritizing payment to subcontractors working on the Home. In February 2009, Wallen ran out of money and ceased operations. Because the Home (1) was not complete and (2) had mechanic's liens attached, Wallen's closure resulted in a breach of the Purchase Agreement.

{66} The Amended Complaint alleged that Bozzone decided to breach the Purchase Agreement in favor of completing homes in which he had a personal financial interest by virtue of having provided construction financing. With respect to this allegation,

the district court found that (1) Bozzone told Montoya not to complete construction on unfinished homes, including the Home, that were within thirty days of closing and (2) Bozzone was only interested in information regarding homes for which he had provided the construction financing. The district court applied these findings in ruling that Bozzone was liable for intentional interference with contractual relations.

{67} Our review of the evidence and trial transcript does not reveal any indication that the decision that Wallen would cease operations or the resulting breach of the Purchase Agreement served Bozzone's private interests or disregarded corporate interests. Nor does our review reveal any indication that determinations to make payment to and to withhold payment from certain vendors served Bozzone's private interests or disregarded corporate interests. The overwhelming weight of the evidence implies instead that despite efforts by Bozzone to stretch available resources, Wallen closed because it was unable to secure additional credit needed to remain open due to the overall nature of the housing industry in 2008 and 2009.

{68} The testimony and evidence cited by the district court in support of its finding of fact number eighty-one, which states that "Bozzone was only interested in information regarding the three homes for which he provided construction financing[,]" demonstrated only that Bozzone had a specific interest in three specific homes at a specific moment in time; not that he was "only interested" in those three

39

homes overall. Even if after making the decision to cease operations Bozzone took a particular interest in certain properties, such conduct did not necessarily serve purely private interests or disregard corporate interests. *See id.* ¶ 21 (observing that an officer's interference with a contract is not—as a matter of law—contrary to the best interest of the company merely because the officer "stood to profit in tandem with the corporation").

{69} Despite the district court's conclusion that "Bozzone's actions were without justification or privilege," no finding of fact suggests the manner in which Bozzone's conduct was undertaken in bad faith or was contrary to Wallen's best interests. *See id.* ¶ 17 ("[A] corporate officer is privileged to interfere with his [or her] corporation's contracts . . . when he [or she] acts in good faith and in the best interests of the corporation[.]"). "A conclusion of law must find support in the findings of fact." *O'Shea v. Hatch*, 1982-NMCA-013, ¶ 17, 97 N.M. 409, 640 P.2d 515. Absent findings of fact that support a conclusion of law as to each element of the claim alleged, substantial evidence does not support the district court's ruling. *See Lucero*, 1994-NMCA-128, ¶ 21 ("[E]vidence must be adduced to support each element necessary to support a claim.").

{70} At least one of the district court's findings of fact refers to decisions made by Wallen, or by Bozzone in his individual capacity, as violative of Appellees' "rights."

We are unclear as to the "rights" to which this finding of fact refers. Appellees had a "right," based in contract law, to receive the benefit of the Purchase Agreement. They also had a "right" to enforce the Purchase Agreement and to be compensated for damages resulting from a breach. They did not have a "right" to have the construction of the Home prioritized above other corporate interests or to be informed in real time as to the financial health of the corporation. Nor did they have a "right" to priority compensation from monies derived from steps taken to wind down the corporation. Officers of insolvent corporations have a fiduciary duty not to place their own interests above those of creditors. *See Smith v. Cox*, 1992-NMSC-029, ¶ 6, 113 N.M. 682, 831 P.2d 981 ("When a corporation becomes insolvent and can no longer continue in business, the directors and other managing officers occupy a fiduciary relation towards creditors by reason of their position and their custody of the assets." (internal quotation marks and citation omitted)). However, the evidence does not show that, with respect to the three homes for which Bozzone provided construction financing, he utilized Wallen's assets in a manner that prioritized his own interests over Appellees' interests.

{71}     Although we are sympathetic to the circumstances in which Appellees found themselves in the aftermath of Wallen's closure, substantial evidence does not

support a conclusion that Bozzone's conduct constituted intentional interference with contractual relations. We therefore reverse the judgment against him as to that claim.

## C.    Civil Conspiracy

{72}    As stated by our Supreme Court in *Deflon*, "civil conspiracy is not actionable by itself and survives only if the underlying claim . . . survives[.]" 2006-NMSC-025, ¶ 16. Because we reverse the district court's ruling that Bozzone intentionally interfered with contractual relations, we also reverse the judgment against him as to Appellees' claim of civil conspiracy.

## D.    Conclusion as to Bozzone

{73}    For the reasons discussed herein, we reverse the judgment against Bozzone as to Appellees' claims of prima facie tort, intentional interference with contractual relations, and civil conspiracy.

## IV.    APPLICABILITY OF THE UNFAIR PRACTICES ACT

{74}    On cross-appeal, Appellees argue that the district court erred in dismissing their unfair trade practices claim against both Appellants. In support of their argument, Appellees claim that case law relied upon by the district court is inapplicable to the factual scenario in the present case and that "construction services"—such as those provided to Appellees by Wallen—fall within the scope of Section 57-12-2. This argument raises a question of statutory construction that we

42

review de novo. *See Pub. Serv. Co. of N.M. v. Diamond D Constr. Co.*, 2001-NMCA-082, ¶ 48, 131 N.M. 100, 33 P.3d 651.

{75} "Our primary goal in interpreting statutes is to give effect to the [L]egislature's intent." *Id.* In doing so, we "look to the plain language of the statute to discern [legislative] intent." *Carrillo v. My Way Holdings, LLC*, 2017-NMCA-024, ¶ 22, 389 P.3d 1087. "When statutory language is clear and unambiguous, this Court must give effect to that language and refrain from further statutory interpretation." *Id.* (internal quotation marks and citation omitted).

{76} The Unfair Practices Act "prohibits misrepresentations made in connection with the sale of goods or services by a person in the regular course of his trade or commerce." *Lohman v. Daimler-Chrysler Corp.*, 2007-NMCA-100, ¶ 21, 142 N.M. 437, 166 P.3d 1091 (alteration, omissions, internal quotation marks, and citation omitted). The key terms for purposes of our statutory interpretation, are "trade or commerce," which is statutorily defined as the "sale . . . of any services and any property," Section 57-12-2(C); "goods," which this Court has previously defined as "personal estate *as distinguished from realty*"; and "services," which this Court has previously defined as "work done by one person at the request of another." *McElhannon v. Ford*, 2003-NMCA-091, ¶ 17, 134 N.M. 124, 73 P.3d 827 (internal quotation marks and citations omitted).

43

{77} In *McElhannon*, we discussed these terms in the context of real estate transactions, concluding that "[t]o the extent goods and services are combined to create a structure that is permanently affixed to realty, . . . a sale of a completed house is not a sale of goods or services for purposes of Section 57-12-2(D)." *McElhannon*, 2003-NMCA-091, ¶ 17. We predicated our holding in *McElhannon* upon the fact that the house at issue was "completed," such that, in context, the definitions of goods and services are "combined" rather than viewed independently. *Id.* ¶¶ 3, 17.

{78} The factual scenario in the present case is distinguishable from *McElhannon* and presents a question of first impression for this Court. Rather than entering a sales agreement for a completed house, the Purchase Agreement called for Wallen to construct the Home on a designated vacant lot. Importantly, Appellees never received a "completed" house because Wallen closed before completing construction on the Home. Under such circumstances, the "combined" view of goods and services expressed in *McElhannon* does not apply. Instead, we must consider the plain meaning of the word "services" as it is used in Section 57-12-2(D).

{79} In *Keiber v. Spicer Construction Co.*, 619 N.E.2d 1105, 1106 (Ohio Ct. App. 1993), the Ohio Court of Appeals analyzed the applicability of the Ohio Consumer Sales Practices Act (OCSPA) under similar circumstances. The plaintiffs' claims arose from a sales agreement between the parties for the construction and purchase

44

of a new house. *Id.* With the exception of breach of contract, the district court dismissed the plaintiffs' claims as barred by "extant . . . case law." *Id.* This ruling appeared to result from the district court's reading of precedential case law holding that the OCSPA was "inapplicable to pure real estate transactions." *Id.* at 1106-07 (internal quotation marks and citation omitted).

{80} At the time *Keiber* was decided, the OCSPA defined "consumer transactions as a sale . . . of an item of goods, a service, franchise, or intangible to an individual for purposes that are primarily personal, family, or household[.]" *Id.* at 1107 (omission, internal quotation marks, and citation omitted). Interpreting the statute, the Ohio Court of Appeals held that

> [a]lthough the OCSPA has been deemed not to apply to the sale of a pre-existing residence, we conclude that a contract to build a new home is distinguishable; a residential contractor, especially when engaged in the design, construction, and sales of multiple dwellings, is a supplier of consumer-oriented services for purposes of the OCSPA.

*Id.* It based its conclusion, at least in part, on the plain language of the statute, which provided "no express exclusion of residential construction services." *Id.*

{81} The same can be said of Section 57-12-2. The construction services provided by Wallen were undoubtedly "work done by one person at the request of another." *McElhannon*, 2003-NMCA-091, ¶ 17 (internal quotation marks and citation omitted). Section 57-12-2(C) currently defines "trade or commerce" as the "sale . . . of any

45

services and any property." The all-encompassing nature of this definition does not render it ambiguous. *See Martinez v. Cornejo*, 2009-NMCA-011, ¶ 16, 146 N.M. 223, 208 P.3d 443 ("A statute is ambiguous when it can be understood by reasonably well-informed persons in two or more different senses." (internal quotation marks and citation omitted)). In the absence of language expressly including or excluding construction services, construction services rendered prior to the completion of a residential home are "any services" as defined in Section 57-12-2.

## V.    CONVERSION

{82}    Appellees additionally argue that the district court erred in granting Bozzone's motion to dismiss their conversion claim pursuant to Rule 1-041(B) NMRA. This Court reviews "the involuntary dismissal of a plaintiff's case under Rule [1-0]41(B) for failure to carry a burden of proof as we review any other judgment on the merits." *Camino Real Mobile Home Park P'ship v. Wolfe*, 1995-NMSC-013, ¶ 14, 119 N.M. 436, 891 P.2d 1190, *overruled on other grounds by Sunnyland Farms, Inc. v. Cent. N.M. Elec. Coop.*, 2013-NMSC-017, ¶¶ 14-16, 301 P.3d 387. In doing so, we are "bound by the trial court's findings of fact unless they are demonstrated to be clearly erroneous or not supported by substantial evidence." *Roybal v. Morris*, 1983-NMCA-101, ¶ 30, 100 N.M. 305, 669 P.2d 1100.

{83} "Conversion is the unlawful exercise of dominion and control over personal property belonging to another in exclusion or defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Muncey v. Eyeglass World, LLC*, 2012-NMCA-120, ¶ 22, 289 P.3d 1255 (internal quotation marks and citation omitted). We address each segment of this definition in turn.

**A.    Unlawful Exercise of Control in Exclusion or Defiance of the Owner's Rights**

{84}    A cognizable claim for conversion derives from a "right" related to personal property. "Rights," however, are not self-determined but must, instead, arise from either contract or law. The Purchase Agreement created a duty on the part of Wallen to construct and deliver the Home. It did not, however, convey Appellees a "right" to earmark monies paid to specific uses.

{85}    In *D'Ambrosio v. Engel*, the plaintiff provided a deposit on the purchase of a sailboat pending inspections. 741 N.Y.S.2d 42, 43 (App. Div. 2002). Following the inspections, the plaintiff declined to complete the transaction and demanded return of his deposit. *Id.* The defendants refused. *Id.* The plaintiff filed a claim to recover the deposit, and the trial court entered a judgment in the amount of the deposit, plus costs. *Id.* The plaintiff later filed additional claims, including prima facie tort and conversion. The trial court dismissed these claims. *Id.* at 43-44. The appellate court

47

affirmed, holding that the plaintiff "failed to show that there was a legal duty imposed upon the defendants independent of the contract itself, or that the defendants engaged in tortious conduct separate and apart from their failure to fulfill their contractual obligations." *Id.* at 44 (alterations, internal quotation marks, and citation omitted).

{86}    We find *D'Ambrosio* persuasive as to Appellees' conversion claim. Appellees paid $165,111 pursuant to the Purchase Agreement. The Purchase Agreement expressly entitled them to remedies articulated therein. It did not, however, create an independent duty related to monies paid by Appellees pursuant to the Purchase Agreement. Because "such duty must spring from circumstances extraneous to, and not constituting elements of, the contract," substantial evidence supports dismissal. *Id.* (internal quotation marks and citation omitted).

**B.    Unauthorized and Injurious Use of Another's Property**

{87}    Similarly, substantial evidence supports a finding that Bozzone did not participate in the "unauthorized and injurious use" of Appellees' property. *Muncey*, 2012-NMCA-120, ¶ 22 (internal quotation marks and citation omitted). The Purchase Agreement does not dictate or in any way restrict Wallen's use of monies paid by Appellees pursuant to the Purchase Agreement. The district court's findings of fact related to the use of monies paid by Appellees, while generally supported by Montoya's testimony, find no support in the Purchase Agreement. *See Littell v.*

48

*Allstate Ins. Co.*, 2008-NMCA-012, ¶ 13, 143 N.M. 506, 177 P.3d 1080 ("In reviewing a sufficiency of the evidence claim, this Court views the evidence in a light most favorable to the prevailing party and disregards any inferences and evidence to the contrary." (alteration, internal quotation marks, and citation omitted)). Because neither Wallen nor Bozzone engaged in unauthorized use of Appellees' property "separate and apart from their failure to fulfill their contractual obligations," substantial evidence supports dismissal. *D'Ambrosio*, 741 N.Y.S.2d at 44 (alterations, internal quotation marks, and citation omitted).

## C. Wrongful Detention After Demand

{88}     Finally, no evidence supports a finding that Bozzone refused a demand to return Appellees' property. *See Nosker v. Trinity Land Co.*, 1988-NMCA-035, ¶ 20, 107 N.M. 333, 757 P.2d 803 (stating that "the demand must be made before the action for conversion is brought"). On March 18, 2009, Appellees sent a demand letter to Wallen, which was copied to Wallace, Bozzone, and Filener. However, this correspondence appears to have been directed to an incorrect email address,[6] a circumstance that calls into question whether Bozzone was aware of Appellees'

---

[6]Appellees' demand letter indicated that it was copied to mbazzone@wallenbuilders.com. Based upon spelling alone, this is not an email address owned by Bozzone. Furthermore, a sampling of the admitted documents demonstrate that Bozzone's email address was mark@baydevco.net.

demand. Furthermore, the uncontroverted evidence at trial was that Bozzone played no role in the liquidation and distribution of Wallen's assets after operations ceased. As such, even if we impute knowledge of Appellees' demand to Bozzone, substantial evidence supports dismissal because Bozzone took no part in the decision-making process to detain Appellees' money after demand was made.

## VI.   CONCLUSION

{89}    For the reasons discussed herein, we reverse the district court's judgment as to both Appellants and remand as to Bozzone only for additional proceedings consistent with this opinion.

{90}    **IT IS SO ORDERED.**


_____
**JAMES J. WECHSLER, Judge**


**WE CONCUR:**


_____
**LINDA M. VANZI, Chief Judge**


_____
**JONATHAN B. SUTIN, Judge**